### McCORMICK v. SHIPPY.

(District Court, S. D. New York.  December 1, 1902.)

1. CHARTER PARTY—DEMISE OF VESSEL—STIPULATION RELIEVING CHARTERER FROM LIABILITY FOR NEGLIGENCE OF MASTER.

A time charter of a steam yacht, to be delivered in commission, contained a provision that "the charterer shall assume no responsibility for loss or damage to the yacht," and a clause in the printed form requiring the charterer to keep the vessel insured for the benefit of the owner was stricken out. It also provided that the hire should continue until her redelivery in good condition, "unless lost," and that, in case of her loss during the term, hire paid in advance and not earned should be returned. She was delivered in commission, and the officers and crew were retained by the charterer; the master being recommended by the owner as competent to navigate the yacht, both as master and pilot, in any waters within the limits of the contract, in conjunction with local pilots. The charterer had no knowledge of navigation, and accepted and relied upon the master in all respects. The yacht was lost through the negligence of the master in failing to take a pilot in waters with which he was unfamiliar, though his taking one was suggested by the charterer. *Held* that, although the charter was a demise of the vessel, which made the master the agent of the charterer, who would be responsible for his negligence to third persons, and ordinarily as between the parties, he was protected from liability to the owner for the loss of the yacht by the provisions of the charter, by which the owner clearly assumed the risk of such loss.

2. SAME—VALIDITY—PUBLIC POLICY.

A stipulation, in a charter demising a vessel, by which the risk of loss or damage to the vessel through the negligence of the master, which the law would otherwise cast upon the charterer, is assumed by the owner, is not invalid as against public policy.

In Admiralty.  Action by owner against charterer, to recover for loss of vessel.

Alexander & Ash, Robert D. Benedict, and Mark Ash, for libellant.
Perkins & Jackson, Charles C. Burlingham, and Edward C. Perkins, for respondent.

ADAMS, District Judge.   This is an action brought by the libellant, as owner of the steam yacht "Rapidan," against the respondent, as charterer of the yacht, for the loss of the yacht on Cape Henlopen, on the 10th day of September, 1901.   The agreement between the parties was contained in a charter party of which the following is a copy:

### "Time Charter.

"This agreement made and concluded upon in the City of New York the 23rd day of March, 1901, between R. Hall McCormick, owner of the screw steam yacht Rapidan, of Oswego, N. Y., of 82 tons gross register and 58 tons net register and provided with the proper certificate for hull and machinery and valued at $20,000, and Henry L. Shippy, Treasurer, charterer,

"Witnesseth: that the said owner agrees to let and the said charterer agrees to hire the said steam yacht from Aug. 15th, 1901, to September 15th, 1901, to be placed at the disposal of the charterer at New York, N. Y., and being on her delivery tight, staunch, strong and fitted for service, including necessary equipment, to be employed as a private yacht for use on the coast and inland waters of the United States north of Cape Hatteras as the charterer shall direct, on the following conditions:—

"1. That the charterer shall provide and pay for all coal, port charges, pilotage, provisions, wages of crew, deck, engine room and other necessary stores and all other charges whatsoever and shall maintain the yacht in a thoroughly efficient state, in hull and machinery, for and during the service. The yacht to be ~~put~~ delivered in commission by the owner.

"2. ~~That the yacht shall be insured for the benefit of the owner and~~ That the charterer shall assume no responsibility for loss or damage to the yacht. ~~covered by the terms of said insurance.   The premium on the policy of insurance to be paid by the charterer.~~

"3. That the charterer shall accept and pay for all coal in the yacht's bunkers at the time of delivery and that the owner shall on expiration of this charter party pay for the coal left in the yacht's bunkers at the current market prices at the port of New York.

"4. That the charterer shall pay for the use and hire of said yacht the sum of $3,500, Thirty Five Hundred Dollars, commencing on and from the day of her delivery as aforesaid and at and after the same rate for any additional time; hire to continue until her delivery in like good order and condition to the owner, unless lost, at New York, N. Y.

"5. Payment of hire to be made in cash, in advance, as follows:— The full charter price on delivery of yacht to charterer and in default of such payments, the owner shall have the privilege of withdrawing said yacht from the service of the charterer without prejudice to any claim the owner may otherwise have on the charterer in pursuance of this charter.

"6. That should the yacht not be ready on or before August 15th, 1901, charterer to have the option of cancelling this charter at any time not later than day of yacht's readiness.

"7. That should the yacht be lost, hire paid in advance and not earned, reckoned from the day of her loss, shall be returned to the charterer.

"~~8. That the charterer has the option at any time during the term of this charter of purchasing the said yacht for the sum of ____ against which any amount paid for the hire of the yacht shall be set off and deducted.~~

"9. That should any dispute arise between the owner and the charterer, the matter in dispute to be referred to three persons in New York, one to be appointed by each of the parties hereto and the third by the two so chosen.

Their decision or that of any two of them shall be final. And for the purpose of enforcing any award, this agreement may be made a rule of the court.

"10. Penalty for non-performance of this contract shall be the estimated amount of damages.          R. Hall McCormick, Owner.

Frank Bourne Jones.                                            Charterer.
Witness.
Witness.

Charter extended to Oct. 31st for $3000 additional as per agreement.
June 10th, 1901.   P 437 Letter Book 34.

Aug. 16th   Recd $6500.00 on the above being
     1901      the full amt of the charter money.
                         R. Hall McCormick."

The yacht was delivered to the charterer at New York on the 15th day of August, who ran her from that time until she was lost. The libel alleges, and the answer denies, that the respondent was in sole charge of the vessel at the time she was lost; that she was lost while she was in the possession of the respondent and being navigated by him and in consequence of his negligence and his failure to fulfill the terms of the contract in providing a competent master and crew, or licensed pilot, and in manning and equipping the vessel and maintaining her in an efficient state. Further answering, the respondent relies for exoneration upon the terms of the contract, particularly wherein it was provided that though the charterer was to pay the wages of the crew, the vessel was to be delivered in commission by the owner and that the respondent should assume no responsibility for loss or damage to the yacht, and alleges that the yacht was delivered to the respondent in commission under the command of a master and manned by officers and crew selected and hired by the libellant, all of whom, with unimportant exceptions, continued to serve on the yacht until she was lost and that at all times the yacht remained under the command of the said master and at no time did the respondent, either personally or by any agent, take charge of the yacht or any part in her navigation. It is further alleged that the loss was due to perils of the seas.

I find that the yacht was delivered to the charterer in conformity with the provisions of the contract and remained under the charge of the master who had been for some time before employed by the owner when the yacht was in his own service and who was regarded by him as entirely competent to navigate the yacht, both as master and pilot, in any waters with which he was familiar, and in any waters within the limits of the contract, in conjunction with local pilots. The owner recommended the master to the charterer fully in these respects and he was accepted and relied upon by the latter, who was not himself competent to navigate the yacht, in all respects in which a yacht owner or charterer might reasonably depend upon an expert navigator. During the earlier part of the chartered period, the yacht had been employed in trips east, through Long Island Sound. Upon one of these trips, the charterer had mentioned to the master a possible trip to the Delaware Bay in the vicinity of Cape May, and on the 8th of September, when the yacht was in New York Harbor, the charterer gave orders to the master to fit her out for such trip. The master was not familiar with the waters of Delaware Bay, or the approaches thereto, but said there would be no difficulty in mak-

ing a daylight run and asked for charts of the vicinity, which the charterer provided. The start was made on the 10th, though not at as early an hour as was expected and it was getting dark when the vicinity of Atlantic City was reached but the master did not suggest the necessity of making harbor there and the charterer, relying upon the master's ability to navigate the yacht safely to her destination, gave no order for a harbor. The weather was very fine at the commencement of the voyage, but it had become somewhat overcast and the sea had increased, with a southerly breeze, but there was nothing then to excite apprehension, and the voyage continued. About 8 o'clock in the evening the vicinity of Cape May was reached. At this time the sea was rough enough to affect this small yacht and the master concluded to seek the shelter of the Delaware Breakwater, near Cape Henlopen, instead of going to Cape May, as originally intended. He had been studying the charts on the way down and concluded that he was competent to navigate the vessel in to the harbor without the aid of a pilot and was so confident of his ability that he not only did not seek a pilot but suffered a steam pilot boat to pass him, without observing her, or her signalled offer to furnish a pilot, notwithstanding the charterer, and a guest who was with him, suggested to him that a pilot should be obtained. Proceeding with a view that he understood the situation, having passed the Overfalls Lightship on his port hand, he steered, as he thought, for an entrance to the Breakwater harbor, but made no allowance for a strong ebb tide, with the consequence that he lost his bearings and, still going ahead, brought the yacht up on the point of Cape Henlopen, where she became a total loss, fortunately without loss of life.

There can be no doubt that the loss was attributable to the master's negligence and the question to be determined is, who was responsible therefor.

It would seem that the charterer, in this case, was owner pro hac vice of the vessel. The contract was a demise of the vessel itself, with its furniture and apparel, described locatio navis et operarum magistri as distinguished from locatio operis vehendarum mercium —Abb. Ship. *46—and no difficulty could arise in determining responsibility of the charterer to third parties and ordinarily none as between the parties themselves, when negligence is shown on the part of the charterer or his agents—Leary v. U. S., 14 Wall. 607, 20 L. Ed. 756; U. S. v. Shea, 152 U. S. 178, 14 Sup. Ct. 519, 38 L. Ed. 403; Association v. Moore, 183 U. S. 642, 654, 22 Sup. Ct. 240, 46 L. Ed. 366; Dredging Co. v. Hughes (D. C.) 113 Fed. 680—although the yacht was delivered to the charterer in commission, and the master was strongly recommended by the owner, nevertheless, the master was paid by the charterer and was subject to his directions. It is clear that the master was the agent of the charterer, as immediate owner, and that the charterer was responsible in all respects for the master's negligence, unless he had exonerated himself by a special and binding stipulation in the contract.

It is to be presumed that the legal obligation was in contemplation of the parties when the contract was entered into and it is apparent that the risk of loss was in their minds, because there were

several provisions with reference thereto. It was first provided that the charterer should assume no responsibility for loss or damage to the yacht; then that the hire should continue until the period of her return, unless she should be lost, and finally, that if the yacht should be lost, that the hire paid in advance and not earned should be returned. From these provisions, it seems plain that it was intended the owner, not the charterer, should bear the burden of the risks incident to the navigation of the vessel and such view is strengthened by the provisions with respect to insurance. The contract in the original form provided for indemnity to the owner against loss by insurance to be furnished by the charterer, so that the latter should be under no liability which was covered by the insurance but this was changed so that it was provided that the charterer should assume no responsibility for loss or damage to the yacht. It is urged by the libellant that the language employed, "loss or damage to the yacht," did not go to the extent of relieving the charterer from liability for loss of the yacht, but was only intended to cover some injury to the yacht, and not a total loss, but the intent to be gathered· from the whole instrument is, I think, that the owner undertook the responsibility which would otherwise have fallen upon the charterer and it is significant of this intention that he actually indemnified himself by insurance against the loss which occurred.

I must conclude, therefore, that the charterer has relieved himself from the liability unless the contract, in such respect, is repugnant to the law. The libellant contends that it is void, citing: The Syracuse, 12 Wall. 171, 20 L. Ed. 382; The American Eagle (D. C.) 54 Fed. 1010; The Jonty Jenks (D. C.) Id. 1021. These cases merely hold that in a towage contract, a provision that a boat shall be towed at her own risk, does not exempt the towing boat from the consequences of negligence on her part. The point in The Syracuse, the leading case, was whether such a contract relieved the towing boat from the exercise of reasonable care, caution and maritime skill, and it was held that it did not, without a discussion of any principle involved. I do not see how the decision can be extended to cover a case of this character, where the parties, standing in equal relations, have entered into a contract which, as applied to the circumstances of this case as they occurred, simply meant that the charterer should not be liable for the negligence of the master of the yacht, who was recommended to him by the owner, as competent to navigate her in the waters covered by the contract, provided the charterer should furnish pilots when necessary in waters which were strange to the master. As before stated, the charterer was willing and desirous of furnishing a pilot on this occasion but the master did not consider the employment of one necessary and to hold the charterer responsible for the imputed negligence, arising from the legal relations between him and the master, in the face of the contract, would require some authorities more in point than the cited cases. No question of public policy bears upon this case and no reason appears for the impairment of the right of the private contract here, which should stand as the parties made it—Hartford Fire

Ins. Co. v. Chicago, M. & St. P. R. Co., 175 U. S. 91, 98, 20 Sup. Ct. 33, 44 L. Ed. 84; Railway Co. v. Voight, 176 U. S. 498, 505, 20 Sup. Ct. 385, 44 L. Ed. 560.

Libel dismissed.