PACIFIC IMPROVEMENT CO. v. SCHUBACH–HAMILTON S. S. CO.

(District Court, W. D. Washington, N. D.   May 29, 1914.)

No. 4216.

1. SHIPPING (§ 39*)—CHARTERS—CONSTRUCTION.
      The presumption is that a charter party is a contract of affreightment merely, and the contrary must clearly be made to appear before it will be held to constitute a demise.
      [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 141–148; Dec. Dig. § 39.*]

2. SHIPPING (§ 39*)—CHARTER—CONSTRUCTION—INSURANCE—LIABILITY FOR BREACH OF WARRANTY.
      A time charter of a steamship for three voyages between Puget Sound and Alaskan ports, providing that the owner should pay and provision the master and crew, maintain the vessel, and equipment in efficient condition and be responsible for loss or damage to cargo resulting from insufficiency of tackle, but should be exempted from liability for losses from the usual perils of navigation "even when occasioned by the negligence, default or error in judgment of the pilot, master, mariners or other servants of the shipowners," that the master should prosecute his voyage with the utmost dispatch, and which contained no provision for redelivery in good condition, *held* not a demise of the vessel but an affreightment charter, notwithstanding further provisions that the captain should be under the orders and directions of the charterer as regards employment, agency, and other arrangements, and the prosecution of the voyage, and that he should be furnished by the charterer with all requisite instructions and sailing directions; such provisions contemplating only such orders as the charterer might see fit to give in the matter of cargo, fuel, loading and discharging, the ports to be made, etc., leaving the owner responsible for the general navigation of the vessel and for a breach by the master of a warranty in the insurance policy by entering Bering Sea before the date stipulated therein.
      [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 141–148; Dec. Dig. § 39.*]

In Admiralty.   Suit by the Pacific Improvement Company against the Schubach-Hamilton Steamship Company.   Decree for respondent.

Huffer & Hayden, of Tacoma, Wash., for libelant.

Bogle, Graves, Merritt & Bogle, of Seattle, Wash., for respondent.

CUSHMAN, District Judge.   The question in this case is one of liability, as between the owner and charterer, for injuries to the chartered vessel in the ice of Bering Sea, and depends upon the construction of the charter party.

The owner of the steamship San Mateo, by a letter dated February 27, 1909, proposed a charter of that vessel to the respondent, which was accepted.   The letter was as follows:

"Gentlemen: Referring to our conversation with your Mr. Schubach, concerning charter of the San Mateo for season 1909, Alaska business:

"As per our verbal understanding, we will charter the San Mateo to your company, under government form, at rate of $250.00 per day.

"This company will install four sets of winches, vertical type 8x10, and 8 new booms, as mentioned in your letter to me of February 26th.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

"We will forward the vessel to Seattle at once for dockage and necessary work, all of which will be done under supervision of our representative at Seattle, Mr. W. E. Pearce.

"Charter party to begin May 20th to 25th; to consume three trips of not less than 135 days, and not to extend beyond the insurance limit on Alaska business.

"It is understood, that you are to pay in addition to the daily rate mentioned above, the increased insurance demanded on vessels plying between Seattle and Alaska points.

"It is understood that you will nominate a captain, subject to our approval, who will operate the vessel as an employé of the Pacific Improvement Company, and be paid by us. This captain also to be selected jointly with you and Mr. Pearce, our representative of this company at Seattle.

"Further, that you will buy Carbon Hill coal for operating the San Mateo during life of charter party, at prevailing rates."

On May 6th, a charter party was entered into, the material portions of which are:

"That the former party (Pacific Improvement Company) agree to let, and the latter party (Schubach-Hamilton Steamship Company) agree to hire the said steamship San Mateo for three round trips, between Seattle and St. Michael and Nome, Alaska. The hire to commence from the day on which she is delivered to or placed at the disposal of the charterers at Seattle, Washington, on or about May 24, 1909, in such dock or such safe wharf or place (where she may always safely lie afloat), as charterers may direct, she being then ready with clear holds, tight, staunch, strong and every way fitted for the service (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage); to be employed in such lawful trades as charterers or their agents shall direct, as hereinbefore stated, on the following conditions:

"That the owners shall provide and pay for all provisions and wages of the captain, officers, engineers, firemen and crew; shall pay for the insurance on the vessel and consular fees; also for all deck, galley and engine-room stores, bunker coal excepted, and maintain her in a thoroughly efficient state in hull and machinery for the service.

"That the charterers shall provide and pay for all bunker coals, port, light and dock charges, pilotages, agencies, commissions, laborage, Suez and other canal dues when incurred, also all charges appertaining to the cargoes they may put on board.

"That the charterers shall accept and pay for all coal in ship's bunkers upon commencement of hire; and the owners shall on expiry of this charter party pay for all coal then left in the bunkers, at current market prices of the port where the hire begins and ends.

"That the charterers shall pay for the use and hire of the said vessel at and after the rate of two hundred and fifty & no/$_{100}$ ($250.00) dollars, United States gold coin per day, payment to be made in cash in advance monthly, commencing on the day of delivery as aforesaid; hire to continue from the time specified for terminating the charter until her redelivery to owners (unless lost) at Seattle, Washington, on or before October 25, 1909, and to be payable in San Francisco or at owners' option by telegraphic transfer on London at their expense.

"Should the vessel be on a voyage occupying more time than herein stipulated, the rate of hire for such additional period to be in the same proportion as above, and if redelivered with owners' consent, before the expiration of the time stipulated, a corresponding rebate of hire to be allowed.

"In default of punctual and regular payment or payments as herein specified, the owners shall have the right of withdrawing the vessel from the service of the charters, without prejudice to any claim they may otherwise have on the charterers, in pursuance of this charter.

"That the cargo or cargoes shall be laden and/$_{or}$ discharged in any dock, or at any wharf or place that charterers may direct where the vessel can always safely lie afloat.

"That the whole reach, burden, and passenger accommodation, if any (for cattlemen and cabin passengers), of the ship (not being more than she can reasonably stow and carry) shall be at the charterers' disposal, reserving only proper and sufficient space for ship's officers, crew, tackle, apparel, furniture, provisions and stores. The steamer to give the entire deck space for stock. Ballast tanks to be at the disposal of charterers for conveyance of fresh water, said fresh water to be paid for by the charterers. Steamer not responsible for mortality, nor for stock washed overboard. Charterers to have the privilege of loading any usual lawful deck cargo to be carried at charterers' and/or shippers' risk.

"That the captain shall prosecute his voyage with the utmost dispatch, and under the direction and control of charterers, and shall render all customary assistance with any cranes and/or winches the steamer has, also with her crew and boats (and likewise work the condenser when required), and when in port to work from 7 a. m. to 5 p. m., or during such hours as charterers or their agents may require, charterers paying usual overtime.

"That the captain shall be under the orders and direction of the charterers as regards employment, agency, or other arrangements; and shall sign bills of lading as presented, and at any rate of freight the charterers or their agents may choose, without prejudice to this charter party; and the charterers hereby agree to indemnify the owners from any consequences and liabilities that may arise from the captain signing such bills of lading, or in his otherwise following the charterer's instructions.

"That the owners shall provide all ropes, falls, blocks and slings necessary for handling ordinary cargoes up to three tons weight, also sufficient lanterns for night work. Should ship or cargo be damaged through insufficiency or inefficiency of the steamer's tackle, the loss or damage so occasioned to be assured or paid for by the owners.

"That if the charterers shall have reason to be dissatisfied with the conduct of the captain, officers or engineers, the owners shall, on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

"That the steamer shall dock and paint when and where required by charterers, but not more than once in every six months, at owners' expense, time so occupied not to be paid for by charterers.

"That the master shall be furnished, by the charterers, from time to time, with all requisite instructions and sailing directions, and shall obey the same, and shall keep a full and correct log of the voyage or voyages, which are to be patent to charterers or their agents. That the owners shall not be responsible for damage to or claims on cargo, caused by bad stowage, the stevedores being employed by the charterers.

"Average, if any, to be settled according to York-Antwerp Rule, 1890.

"That in the event of loss of time from deficiency of men or store, breakdown of machinery, collision, docking, stranding or other accident, or damage, or by detention by process of any court, government or authority for any cause for which owners are liable preventing the working of the vessel for more than twenty-four consecutive hours, the time lost shall be allowed to the charterers; including first twenty-four hours, and if such detention shall exceed thirty days charterers to have the option of canceling this charter; but should the vessel be driven into port or to anchorage, by stress of weather, or from accident to the cargo, such detention or loss of time shall be at the charterers' expense.

"That should the vessel be lost, the hire is to cease and determine on the day of her loss, and if missing from the date when last heard of, and any hire paid in advance and not earned shall be returned to charterers.

"The ship has liberty to call at any ports in any order, to sail with or without pilots, and to tow and assist vessels in any situation, and to deviate for the purpose of saving life or property.

"The act of God, perils of sea, fire, barratry of the master and crew, enemies, pirates, and thieves, arrests and restraints of princes, rulers and people, collisions, stranding, and other accidents of navigation excepted, even

when occasioned by negligence, default or error in judgment of the pilot, master, mariners or other servants of the shipowners.

"Ship or owners not answerable for losses, damage, or personal injuries arising through explosion, bursting of boilers, breakage of shafts or tackle, not arising from negligence of said owners, or any latent defect in the machinery or hull, not resulting from want of ordinary diligence by the owners of the ship, or any of them in supplying such boilers, shafts, tackle, machinery or hull.

"That should any dispute arise between the owners and charterers as to the meaning and intention of this charter party, or as to any act or thing to be done thereunder, the matters in dispute shall be referred to three commercial persons in San Francisco, one to be appointed by each of the parties hereto, and a third by the two so chosen, their decision or that of any two of them shall be final, and, for the purpose of enforcing any award, this agreement may be made a rule of court.

"That the owners shall have a lien upon all cargoes and subfreights for arrears of hire, port charges, or any disbursements, coals, etc., unpaid, and charterers to have a lien on the ship for all moneys paid in advance and not earned.

"That all salvages, derelicts, shall be for owners' and charterers' equal benefit.

"In the event of war, being declared during the currency of this charter, by or against the nation to which the steamer belongs charterers to have the option of canceling this charter and also the option of canceling if steamer is not delivered as above in seaworthy condition on or before May 24, 1909, but hire not to commence before the 22d day of May, 1909.

"The charterers hereby agree to pay the extra insurance on hull and machinery valued at not over one hundred and eighty-five thousand ($185,000) dollars, for the privilege of sailing in Alaskan waters.

"If the ship is not redelivered to owners at Seattle on or before October 25, 1909, the charterers agree to pay the further extra insurance incurred by not being out of Alaskan waters on or before October 15, 1909.

"It is agreed that the charterers will pay at the rate of fifty (50) cents per meal for meals served on board at St. Michael and Nome to men who are not on the ship's articles, and one (1) dollar per day for pursers and freight clerks employed by the charterers.

"It is also agreed that the charterers will purchase Carbon Hill coal, when obtainable, at current market prices, throughout this charter party.

"Penalty for nonperformance of this contract estimated amount of damages."

On May 17th, libelant, from San Francisco, wrote respondent a letter, in part, as follows:

"Gentlemen: The following is copy of a slip that will be attached to our insurance policies, covering trips to Alaska, as per current charter party. Will you kindly note and be governed accordingly.

"'Pacific Improvement Company.

"'In consideration of $——— additional premium, at the rate of 2 per cent., permission is hereby granted for the steamer San Mateo to use ports and places in Alaska (excluding inside passages north of Comox) during the season of 1909, but warranted not to proceed north of Unalaska or Dutch Harbor into Bering Sea before June 8th, and to leave ports and places in the Bering Sea on the direct homeward trip not later than October 15, 1909. This slip is attached to and hereby made a part of Policy No. ——— issued to Pacific Improvement Company by Edward B. Haldan Co. Established 1879. Insurance ——— San Francisco, April 7, 1909.———.'

"* * * The San Mateo expects to sail this afternoon with a small cargo that can be discharged quickly, and I have no doubt that the steamer will be at your disposal, as requested; that is, May 24th, 7 a. m. We trust that you will be pleased with the recent improvements made on the steamer and that the coming voyages will be successful."

The charterer scheduled and advertised the San Mateo to sale from Seattle May 29th for Nome and St. Michael. She was turned over to the charterer at Seattle May 24th. The charterer instructed the captain to proceed with her to Tacoma to take fuel. Under like instructions, she was moved from dock to dock in taking cargo. The charterer also gave the master loading instructions and cautioned him—

"to use every precaution against accident in the operation of your vessel and discharge of her cargo. You should be duly careful in examining all winches, gear, tackles, falls, slings, and other apparatus used in the discharge, so that in the event of accident claim cannot be made against us for furnishing insufficient material.

"If any of the winchmen or others in position to negligently injure any of the men show any incompetency or disposition to be careless, do not hesitate to supplant them with proper men."

The master of the vessel testified:

"About 5 o'clock on May 30th, Sunday morning, on May 28th or 29th, I am not just quite sure of the date, I said to Mr. Dawson, 'I presume you will have some sailing instructions for me, Mr. Dawson, before I sail?' 'Oh,' he said, 'Captain, there is no use of my wasting my time and taking up your time, you know what to do just as well as I do; when the ship is loaded you go ahead and do the best you can, and get her up there as soon as you can, and take care of your ship, and take care of your crew."

The owner furnished the master with a copy of the charter party. It does not appear that the captain was advised by any one concerning the warranty in the insurance policies, not to proceed north of Unalaska or Dutch Harbor into Bering Sea before June 8th.

The owner placed the insurance. The charterer paid for it. The warranty clause in the policies was customary in insurance for Alaskan waters. Nothing unusual is shown in the time consumed in loading. The ship's former master was retained.

The San Mateo finally sailed from Seattle at 5 o'clock on the morning of May 30th, made ordinary time to Unimak Pass, and entered Bering Sea June 6th, proceeding north of Unalaska and Dutch Harbor before June 8th, and on June 9th got into the ice and was damaged. The insurance company refused to pay the damage on account of the breach of the warranty above set out. Libelant seeks to recover the amount of the damage—which is not disputed—from respondent.

The grounds of respondent's alleged liability are set forth as follows in the libel:

"That respondents, in breach of their contract as contained in said charter party, well knowing that said vessel was not privileged to enter Alaskan waters until the 8th day of June, 1909, by the express condition of the policies of insurance upon her hull and machinery, and the respondent having no right to navigate said vessel in Alaskan waters without insurance covering said vessel, and knowing that said vessel was not covered by insurance on the 6th day of June, 1909, or before the 8th day of June, 1909, wrongfully caused said vessel to be navigated in Alaskan waters, to wit, Bering Sea, before the respondents were privileged so to do under said charter party, and said insurance policies written in pursuance thereof; and the said vessel was damaged by reason of the wrongful, careless, and negligent acts of the respondents, as aforesaid, to the extent of $13,571.82; and that said damage was not due to the ordinary and reasonable navigation, use, and wear and tear upon said vessel."

Libelant's position is that, by the terms of the charter party, the charterer took the whole vessel into its possession and under its sole direction and control in all things, including navigation of the vessel, and that the master of the vessel was, on the voyage, the servant and agent of the charterer, under its sole direction and control.

Libelant relies upon the following authorities: Carver's Carriage by Sea (3d Ed.) p. 140; Newberry v. Colvin (Eng.) 7 Bing. 190; Hills v. Leeds (D. C.) 149 Fed. 878; American Steel-Barge Co. v. Cargo of Coal (D. C.) 107 Fed. 964; The Del Norte (D. C.) 111 Fed. 542; The India (D. C.) 14 Fed. 476; The Bombay (D. C.) 38 Fed. 512; The Endsleigh (D. C.) 124 Fed. 858; Auten v. Bennett, 183 N. Y. 496, 76 N. E. 609, 5 Ann. Cas. 620; Golcar S. S. Co. v. Tweedie Trad. Co. (D. C.) 146 Fed. 563; McCormick v. Shippy (D. C.) 119 Fed. 226; Waterhouse v. Rock Island Alaska Min. Co., 97 Fed. 477.

Respondent relies on the following authorities: Stevens on Charter Parties, p. 45; Zabriskie v. New York (D. C.) 160 Fed. 236; The Santona (D. C.) 152 Fed. 516, 518, affirmed 169 Fed. 275, 94 C. C. A. 551; The Hathor (D. C.) 167 Fed. 194; The Leader (D. C.) 166 Fed. 139; Dunlop S. S. Co. v. Tweedie Trad. Co., 178 Fed. 673, 102 C. C. A. 173; The Volund, 181 Fed. 643, 104 C. C. A. 373; Luckenbach v. Insular Line, 186 Fed. 327, 108 C. C. A. 405.

A correct decision depends upon whether, under the terms of the charter party, there was a demise of the ship to respondent, with full right of control and navigation, with corresponding responsibility, or whether the charter party was a contract of affreightment, leaving the control of the ship, so far as its navigation was concerned, with libelant.

[1] The presumption is that the contract was one of affreightment, merely, and the contrary must clearly be made to appear before it will be held to constitute a demise. Reed v. U. S., 11 Wall. 591, 601, 20 L. Ed. 220; 36 Cyc. 68.

"Where the provisions of the charter are inharmonious, the general intent, as evidenced by its written portions and its evident leading purpose, should control the minor provisions, and parol evidence is admissible to explain the written contract by applying it to the subject of it, the common-law doctrine of bailment and common carriers being applicable." 36 Cyc. 64.

[2] The charter party provides:

"That the captain shall be under the orders and direction of the charterers as regards employment, agency, or other arrangements; and shall sign bills of lading as presented, and at any rate of freight the charterers or their agents may choose, without prejudice to this charter party; and the charterers hereby agree to indemnify the owners from any consequences and liabilities that may arise from the captain signing such bills of lading, or in his otherwise following the charterer's instructions.

"That the captain shall prosecute his voyage with the utmost dispatch and under the direction and control of charterers. * * *

"That the master shall be furnished, by the charterers, from time to time, with all requisite instructions and sailing directions, and shall obey the same. * * *"

If these provisions stood alone, it might plausibly be contended that full possession and control had passed to the charterer. Yet even that contention would be weakened by an analysis of the foregoing. If full

control was intended to be given, there would be no need to particularize the granted powers, as is done, concerning "employment, agency, and other arrangements" and in signing "bills of lading" and furnishing "requisite" instructions and sailing directions.

This being a time charter, at the agreed price of $250 per day, the provison "that the captain shall prosecute his voyage with the utmost dispatch" would have no place in it if a demise were intended, for the obvious purpose of this provision is to bind the owner to celerity in the carriage that he has undertaken under the contract.

These provisions, so far as orders, directions, instructions, and control upon the part of the charterer are concerned, contemplate such orders as the charterer sees fit to give in the matter of cargo, fuel, loading, unloading, the time of departure from ports, the ports to be made, the order in which made, the wharves, or means to be used in loading or unloading, and similar directions concerning the voyage, and were, evidently, the only ones in contemplation.

That the contract was one of affreightment only is further shown by other provisions of the charter party. It provides that the owner shall pay the officers and crew. This, while not absolutely controlling, is persuasive. It also provides that the owner "shall * * * maintain her (the ship) in a thoroughly efficient state in hull and machinery for the service." It would be impossible for the owner to do this were it not in possession and general control.

That this was not merely a formal undertaking on the part of the owner is shown by the provisions subjecting it to liability for damage in case of not keeping the equipment efficient; the provision to that effect being:

"Should the ship or cargo be damaged through insufficiency or inefficiency of the steamer's tackle, the loss or damage so occasioned to be assured or paid for by the owners."

The provision that docking the vessel and painting be done at the owner's expense—the time occupied not to be paid for by charterer, but charterer to determine when and where it be done—is evidently a limitation, in certain particulars, upon the owner's duty and right in maintaining the ship's efficiency, as provided by the foregoing clause.

In the provisions of the charter party, exempting the owner from the usual perils of navigation, the master is designated as the servant of the shipowner. The provision is as follows; the italics being those of the court:

"The act of God, perils of sea, fire, barratry of the master and crew, enemies, pirates and thieves, arrests and restraints of princes, rulers and people, collisions, stranding, and other accidents of navigation excepted, even when occasioned by negligence, default or error in judgment of the *pilot, master, mariners or other servants of the shipowners.*"

There is no provision in the charter party by which the charterer undertakes to deliver the vessel, on the expiration of the charter party, in as good condition as when received, usual use, wear, and tear excepted. The undertaking of the charterer was "to pay the extra insurance * * * for the privilege of sailing in Alaskan waters." It was not an undertaking to provide and pay for such insurance.

There are many minor provisions in the charter party that argue for

the same construction as that here given; but, as they are not wholly inconsistent with a demise of the vessel, which the foregoing are held to be, for brevity's sake, they will not be dwelt upon.

The charter party in the case of the Del Norte (D. C.) 111 Fed. 542, decision by Judge Hanford, affirmed by the Court of Appeals for this circuit (119 Fed. 118, 55 C. C. A. 220), differed in several important particulars from that in the present case. In that charter party, the owners were to protect the ship against liens for debts contracted prior to the date of the delivery to the charterer. It provided that, upon failure of the charterer to pay the rent for the vessel, as required, "the owners may retake possession of the vessel," and on "his (the owner's request, the master would hold possession of the ship as his representative." The provision of the charter party in the present case is:

"In default of punctual and regular payment or payments as herein specified, the owners shall have the right of withdrawing the vessel from the service of the charterers. * * *"

In the Del Norte Case the charterer was to "have full charge of the vessel during the continuance of the charter party; to pay all expenses of the vessel, including wages of officers and crew." They "to be in all respects under the order and direction of the charterer."

The charter party in that case contained a provision—already mentioned as wanting in the one now before the court—obligating the charterer to redeliver the vessel to the owner, subject only to the exceptions of reasonable wear and tear; damages from collisions, etc. That charter party further provided that the charterer should protect the vessel from being libeled for any matter or thing subsequent to his receiving possession by virtue of the charter party. There were also other provisions in the Del Norte charter party manifesting that a demise of the vessel was intended, which are wholly wanting in the present case.

Decree will be for respondent.