Argued March 6; reversed April 24; rehearing denied June 29, 1945

# HUST *v.* MOORE-McCORMACK LINES, Inc.

(158 P. (2d) 275)

Before BELT, Chief Justice. and ROSSMAN, KELLY, BAILEY, LUSK, BRAND and HAY, Associate Justices.

*Erskine Wood,* of Portland (Wood, Matthiessen & Wood and Lofton L. Tatum, all of Portland, on the brief), for appellant.

*Edwin D. Hicks,* of Portland (Green & Landye and B. A. Green, all of Portland, on the brief), for respondent.

LUSK, J.

The plaintiff was injured on March 9, 1943, while discharging his duties as a seaman on the S. S. Mark Hanna, a "liberty ship" owned by the United States, for which the defendant Moore-McCormack Lines, Inc., was general agent under a "service agreement" designated GAA 4-4-42. The defendant is a Delaware corporation with offices in Portland, Oregon. The accident occurred after the vessel had been torpedoed in the Atlantic Ocean and was being towed to port. The plaintiff was ordered to go to the ship's locker in the forepeak and bring out a mooring line. While crossing the locker room in search of the rope he fell through an uncovered hatch to a lower deck. He brought this action for damages under § 33 of the Merchant Marine, or Jones Act, 41 Stat. 1007, 46 U. S. C. A. § 688, alleging that at the time of the accident the defendant was operating the vessel and he was in the defendant's employ, and that his injury was caused by the negligence of the defendant in failing to provide any light for the locker room and compelling him to carry on his work in total darkness and in failing to maintain

the guard chain around the hatch through which he fell. The case was tried to a jury which brought in a verdict for the plaintiff for $35,000.00.

On the trial the defendant moved for a directed verdict on the grounds that the evidence showed that the plaintiff was not employed by it and that his injury was not caused by its negligence. The court denied the motion, and in its charge left it to the jury to determine as a question of fact whether the relation of employer and employee existed between defendant and plaintiff. The court likewise denied a motion for judgment for the defendant notwithstanding the verdict. On this appeal these rulings are assigned as error.

■ The rights and remedies afforded by the Jones Act are not available to the plaintiff unless he was in the employ of the defendant at the time he was injured. *Nolan v. General Seafoods Corp.,* 112 F. (2d) 515, 517; *The Norland,* 101 F. (2d) 967, 971. The defendant contends that the plaintiff was not its employee; that, under the terms of the service agreement, it had no authority over the hiring of the crew further than to procure the master, who was the agent and employee of the United States, and to make available to the master, officers and men, for engagement by him on behalf of the United States; and that, in fact, at the time of the accident it did not operate or have control of the vessel.

The agreement, dated October 19, 1941, is between the United States, acting by and through the administrator, War Shipping Administration, and Moore-McCormack Lines, Inc., therein referred to as the general agent. By its terms the United States appoints the defendant as its agent and not as an independent contractor, ''to manage and conduct the business of vessels assigned to it by the United States from time

to time'', and the agent accepts the appointment and undertakes so to manage and conduct the business for the United States under the latter's direction of such vessels as may have been or may be by the United States assigned to and accepted by the general agent for that purpose.

By Article 3A the agent agrees to (a) ''Maintain the vessels in such trade or service as the United States may direct, subject to its orders as to voyages * * *''; (b) ''Collect all moneys due the United States under this Agreement and deposit, remit, or disburse the same * * *''; and to (c) ''Equip, victual, supply and maintain the vessels, subject to such directions, orders, regulations and methods of supervision and inspection as the United States may from time to time prescribe''.

Article 3A (d) is as follows:

''The General Agent shall procure the Master of the vessels operated hereunder, subject to the approval of the United States. The Master shall be an agent and employee of the United States, and shall have and exercise full control, responsibility and authority with respect to the navigation and management of the vessel. The General Agent shall procure and make available to the Master for engagement by him the officers and men required by him to fill the complement of the vessel. Such officers and men shall be procured by the General Agent through the usual channels and in accordance with the customary practices of commercial operators and upon the terms and conditions prevailing in the particular service or services in which the vessels are to be operated from time to time. The officers and members of the crew shall be subject only to the orders of the Master. All such persons shall be paid in the customary manner with funds provided by the United States hereunder.''

Article 5. "At least once a month the United States shall pay to the General Agent as full compensation for the General Agent's services hereunder, such fair and reasonable amount as the Administrator, War Shipping Administration, shall from time to time determine * * *''

By Article 7 the United States agrees, with certain exceptions, to reimburse the General Agent "for all expenditures of every kind made by it in performing, procuring or supplying the services, facilities, stores, supplies or equipment as required hereunder", and "to the extent not recovered from insurance" to "reimburse the General Agent for all crew expenditures * * * including * * * all disbursements for or on account of wages, extra compensation, overtime, bonuses, penalties, subsistence, repatriation, travel expense, loss of personal effects, maintenance, cure, vacation allowances, damages or compensation for death or personal injury or illness * * *''

Article 8. "The United States shall, without cost or expense to the General Agent, procure or provide insurance against all insurable risks of whatsoever nature or kind relating to the vessels assigned hereunder (which insurance shall include the General Agent and the vessel personnel as assureds) including, but without limitation, marine, war and P. & I. risks, and all other risks or liabilities for breach of statute and for damage caused to other vessels, persons or property, and shall defend, indemnify and save harmless the General Agent against and from any and all loss, liability, damage and expense (including costs of court and reasonable attorneys' fees) on account of such risks and liabilities, to the extent not covered or not fully covered by insurance. The General Agent shall furnish reports and information and comply fully with all instructions that may be issued with regard to all

salvage claims, damages, losses or other claims. * * *''

Article 14. ''The General Agent shall, unless otherwise instructed, subject to such regulations, instructions, or methods of supervision and inspection as may be required or prescribed by the United States, arrange for the repair of the vessels, covering hull, machinery, boilers, tackle, apparel, furniture, equipment, and spare parts, and including maintenance and voyage repairs and replacements, for the account of the United States, as may be necessary to maintain the vessels in a thoroughly efficient state of repair and condition. The General Agent shall exercise reasonable diligence in making inspections and obtaining information with respect to the state of repair and condition of the vessels, and so advise the United States from time to time, in order that the United States may satisfy itself that the vessels are being properly maintained, and shall cooperate with representatives of the United States in making any inspections or investigations that the United States may deem desirable.''

Article 16. (a) ''The United States shall indemnify, and hold harmless and defend the General Agent against any and all claims and demands * * * of whatsoever kind or nature and by whomsoever asserted for injury to persons or property arising out of or in any way connected with the operation or use of said vessels or the performance by the General Agent of any of its obligations hereunder * * *''

There is no evidence that the defendant did anything in connection with the business of the vessel not contemplated by the terms of the service agreement, or that it exercised or attempted to exercise any control over the master or crew. Indeed, the uncontradicted evidence is that when it was the duty of the defendant to assist in the loading of the vessel it acted under the

instructions of the master as to the time, place and method of loading. And, although under the service agreement the defendant might have been required to arrange for the repair of the vessel, it never did so, but this duty was discharged by a division of the War Shipping Administration.

In accordance with the terms of the service agreement, and as well of collective bargaining agreements between the defendant and the various maritime unions, the crew were procured by the defendant's Portland office through the union hiring halls. The men were sent to the vessel and accepted or rejected by the master, and those who were accepted signed the shipping articles which constitute the contract between the master and the seaman. The articles on their face designate War Shipping Administration, Washington, D. C., as owner of the Mark Hanna and Moore-McCormack Lines, Inc., 5 Broadway, New York, New York, as general agents. The articles are signed as well by a deputy shipping commissioner, who did not testify. But the United States shipping commissioner at Portland, Commander Jones, testified that the regular practice and requirement is for the shipping commissioner or his deputy, who presides over the signing of shipping articles, to read them aloud to the crew.

██ We think it must be assumed in determining whether the plaintiff was an employee of the defendant that the case is governed by the rule of the common law. There has been no suggestion to the contrary, except the plaintiff's contention that the Act of Congress (Public Law 17—78th Congress) 50 U. S. C. A. Append., § 1291, and known as the War Shipping Administration (Clarification) Act of March 24, 1943, is controlling. Of that we shall speak later. The familiar

and well established test of whether one is an employee of another is whether the latter has the right to order, direct and control the former in the performance of the work, and the elements to be considered on that question are the selection and engagement of the servant, the payment of wages, and the power of dismissal. 35 Am. Jur., Master and Servant, 445, 446, § 3. See, *Journal Publishing Co. v. State Unemployment Compensation Commission,* — Or. —, 155 P. (2d) 570, 585. By the terms of the service agreement the defendant was authorized, not to employ, but to procure the master, and it is expressly provided that the master "shall be an agent and employee of the United States, and shall have and exercise full control, responsibility and authority with respect to the navigation and management of the vessel". The defendant was further authorized to "procure and make available to the Master for engagement by him the officers and men required by him to fill the complement of the vessel." Master, officers and men were to be "paid in the customary manner with funds provided by the United States hereunder". This language requires no emendation. It speaks plainly of the intention of the United States to reserve to itself complete control of the vessel's crew through its agent and employee, the master. No room is left for the notion that the defendant had authority to discharge the master or any officer or member of the crew. But the plaintiff argues that the language does not imply an exclusive agency, that "one employee may serve many masters at the same time". The latter statement is doubtless true. Where there are several owners of a vessel, for example, the master may be agent for all. But here, of course, is no question of dual ownership, and we think the language employed does not admit of the construction that the

master is subject to the control of any one else than the United States. And, since the crew "shall be subject only to the orders of the Master", their status as employees of the United States, and of no one else, necessarily follows.

Counsel for the parties have cited no cases, and we have found none, in which the courts have interpreted a stipulation such as that we are now considering in an agreement of this character. But in cases involving charter parties, where the question is whether there has been a demise of the vessel or a mere contract of affreightment, the courts hold that provisions designating the master and mariners as servants of the owner are inconsistent with a construction of the charter party as a demise of the vessel, with resulting right of control and navigation in the charterer rather than the owner. *Pacific Improvement Co. v. Schubach-Hamilton S. S. Co.*, 214 F. 854; *Warner Quinlan Asphalt Co. v. The King*, (1924) Can. S. C. 236, (1924) 2 D. L. R. 853; *Adams v. Homeyer*, 45 Mo. 545, 100 Am. Dec. 391; *Deniff v. Charles R. McCormick & Co.*, 105 Or. 697, 705, 210 P. 703; *Multnomah Co. v. Willamette Towing Co.*, 49 Or. 204, 215, 89 P. 389; *Grimberg v. Columbia Packers' Ass'n.*, 47 Or. 257, 270, 83 P. 194, 114 Am. St. Rep. 927, 8 Ann. Cas. 491; 58 C. J., Shipping, 159, § 226.

■ While it is true that in construing charter parties the presumption is against a demise of the vessel, we think that the analogy of these cases is manifest, and that, if in a charter party a provision to the effect that the master and crew are to be employees of the owner of the vessel means that they are not the employees of the charterer, no different effect should be given to a like provision in the agreement here. To hold otherwise would be, in our opinion, to ignore the

clearly expressed intention of the parties that there should not be a divided control of the vessel, its master and crew. The agreement was made in time of war; the vessels operated under it were and still are, as we judicially know, practically in the military service of the United States; and it is not to be supposed that in those circumstances the War Shipping Administration contemplated anything less than that they should be under the complete and exclusive control of the United States.

To support their contention counsel for the plaintiff point to the following provisions in the service agreement: Article 2. The defendant agrees as "General Agent  *  *  * to manage and conduct the business (of the vessels) for the United States, in accordance with such directions, orders, or regulations as the latter has prescribed, or from time to time may prescribe  *  *  *" Article 3A (c). The defendant agrees "to equip, victual, supply and maintain the vessels". Article 14. The defendant agrees "unless otherwise instructed", to "arrange for the repair of the vessels, covering hull, machinery, boilers, tackle, apparel, furniture, equipment, and spare parts, and including maintenance and voyage repairs and replacements, for the account of the United States, as may be necessary to maintain the vessels in a thoroughly efficient state of repair and condition", and to "exercise reasonable diligence in making inspections and obtaining information with respect to the state of repair and condition of the vessels, and so advise the United States from time to time, in order that the United States may satisfy itself that the vessels are being properly maintained  *  *  *".

■■ It is argued that when the plaintiff, in obedience to the boatswain's order, went to the locker room

to get a mooring line to be used in place of the one that had broken he was aiding in making a replacement and thus performing a duty of the defendant under Article 14 of the agreement.

We think that this is not an admissible deduction. In the first place a significant difference is to be noted between Article 3A (c) and the similar provision in the contract involved in *Brady v. Roosevelt S. S. Co.,* 317 U. S. 575, 87 L. ed. 471, 63 S. Ct. 425. That case is the main reliance of the plaintiff, and will be fully considered later. At this point it is sufficient to say that the Supreme Court sustained liability in an action for wrongful death against the private operator of a vessel owned by the United States Maritime Commission. But in that case the agent agreed to "man" and "operate the vessels", while, under the agreement here, the defendant does not agree to do either. Again in the Brady case the agreement with respect to repairs was that the agent should "exercise reasonable care and diligence to maintain the vessels in a thoroughly efficient state of repair, etc.", while, under the agreement in the present case, the agent was required to "arrange for the repair of the vessels", etc. Referring to the Brady case and to *Quinn v. Southgate Nelson Corp.,* 121 F. (2d) 190, Judge Knox, of the District Court, S. D. N. Y., in the case of *Lewis v. U. S. Nav. Co., Inc.,* 57 F. Supp. 652, said: "In each of these cases the agent was required not only to victual, supply and manage the vessel, but to man it as well." He observed that the difference between the agreements in those cases and the agreement in the case before him (which appears to have been identical with the one here under consideration) was intentional, and said: "Unless, therefore, the plaintiff was unaware that defendant,

in servicing the ship, was acting as an agent of the United States, and was without any authority over the vessel once she was on her way abroad, and thus has a right of action by reason of defendant's failure to disclose its principal, I hardly see how he can recover.'' The court found that such disclosure had not been made, and for that reason that the defendant agent was liable.

The intention of the parties to the agreement must be derived from a consideration of its terms as a whole. *Grimberg v. Columbia Packers' Assoc.,* supra; *Warner Quinlan Asphalt Co. v. The King,* supra. But, to give the language pointed to by the plaintiff the effect claimed for it, would be to ignore other provisions and nullify them. The construction insisted upon is wholly inconsistent with Article 3A (d), and, in view of that subdivision, the only conclusion consistent with fundamental principles governing the interpretation of contracts is that the duties stipulated for in those sections relied on by the plaintiff were only such as could be performed by the defendant while the vessel is in port. The defendant did not engage to arrange for repairs and replacements when the vessel was on the ocean, for it had no servants or employees on the vessel to do this work. Its agreement ''to equip, victual and supply'' the vessel had no connection with its control and navigation, and does not suggest any right of control over the master and crew; while the word ''maintain'' in the same phrase no doubt should bear the meaning which it has in the context of Article 3A (a) where it is provided that the agent shall ''maintain the vessels in such trade or service as the United States may direct, subject to its orders as to voyages, cargoes, etc.'' Much plainer and more explicit language indicating control of the vessel in the charterers is

found in Pacific Improvement Co. v. Schubach-Hamilton S. S. Co., supra, but Judge Cushman, in view of other provisions, said concerning them:

"These provisions, so far as orders, directions, instructions, and control upon the part of the charterer are concerned, contemplate such orders as the charterer sees fit to give in the matter of cargo, fuel, loading, unloading, the time of departure from ports, the ports to be made, the order in which made, the wharves, or means to be used in loading or unloading, and similar directions concerning the voyage, and were, evidently, the only ones in contemplation."

Going beyond the terms of the agreement, the plaintiff contends that certain evidence in the record indicates the existence of an employer-employee relationship between the plaintiff and the defendant. This contention will now be considered.

(1) The defendant, in paying the crew of the vessel on behalf of the United States, used pay envelopes on which its own name was printed. The local manager of the defendant explained in his testimony that the envelopes were used as a matter of economy because they were on hand.

(2) The plaintiff was provided with a "crew-pass and muster card", on a printed form bearing the name of the defendant, but signed, apparently, by the chief mate of the vessel. It does not appear how the chief mate got possession of the crew-pass form, but even though we should infer that the defendant permitted him to take it, there is nothing to show that its issuance was the act of the defendant.

(3) The defendant issued to a member of the crew a printed United States treasury form containing a statement of income tax withheld on the seaman's

wages in which the defendant's name appears in print under the words "employer by whom paid". Under the terms of the service agreement the defendant was required to and did pay the crew their wages (being later reimbursed by the United States). For the purpose of the withholding tax the defendant is deemed an employer under the Internal Revenue Code of the United States (Internal Revenue Code. § 1621, 26 U. S. C. A., § 1621).

(4) There was received in evidence a letter written by the local manager of the defendant to the plaintiff enclosing copies of two other letters. One of these was from the acting assistant general counsel of the War Shipping Administration and was addressed to the defendant at its San Francisco office. The letter discusses the plaintiff's claim, expresses the opinion that his disability is not "compensable under the War Shipping Administration Crew Life and Injury Policy", and that it "is clearly a marine risk and that, therefore, it is a matter to be taken up by you with your marine P. & I. underwriters." The other letter was written by H. W. Dubbin, claim agent of the defendant at San Francisco, to Mr. Tripp, its Portland manager, and says, among other things, in referring to the letter of the acting assistant general counsel of the War Shipping Administration: "This decision is somewhat questionable, nevertheless we will probably have to submit file to the Fulton Underwriting Agency." Before introducing this correspondence in evidence counsel for the plaintiff developed on the cross-examination of Mr. Tripp that the plaintiff had presented his claim to him and that he had referred the claim to Dubbin. The plaintiff argues that this evidence shows that the defendant considered the claim its own obligation, and

in that connection calls attention to Article 16 (a) of the service agreement in which the United States agrees to indemnify the general agent against claims asserted for injury to persons or property arising out of the operation of the vessels. In our opinion the inference sought to be drawn is unwarranted. It is in no sense an admission of liability for an employee of a corporation to whom a claim is presented to refer the matter to another employee whose duty requires him to deal with claims. Nor did the defendant indicate that it deemed itself liable when it in turn, through its claim agent, referred the claim to the War Shipping Administration and later, on the latter's instruction, to its "marine P. & I. underwriters". By Article 8 of the service agreement the United States agreed to provide, without cost to the general agent, insurance against all insurable risks, including P. & I. risks, relating to the vessels (the general agent to be among the assured). The article then provides: "The General Agent shall furnish reports and information and comply fully with all instructions that may be issued with regard to all salvage claims, damages, losses or other claims." It was therefore the duty of the defendant under its contract to refer the claim to its P. & I. underwriters in accordance with the instructions contained in the letter from the acting assistant general counsel of the War Shipping Administration.

There were received in evidence copies of collective bargaining agreements between the several maritime unions and various steamship companies, including the defendant, and copies of a "Statement of Policy" executed by union officials and the War Shipping Administration, together with a copy of a regulation of the War Shipping Administration instructing all

general agents to follow the policy outlined. The statement of policy to which the plaintiff's union (Pacific Coast Marine Firemen, Oilers, Watertenders and Wipers Association) is a party is dated May 4, 1942, several months before the plaintiff signed shipping articles for the voyage on which he was injured. It sets forth Article 3 (d) of the service agreement, and declares that the intention of the clause is that the general agent will procure and make available to the master for engagement by the master, officers and men through channels which the agent has heretofore used for his own merchant ships, for example, through union hiring halls if the general agent has contracts so providing. It is agreed that the existing collective bargaining agreements be frozen for the duration of the war. It is agreed that, in view of the need of the highest standard of order and discipline aboard ship in wartime the unions will cooperate with the War Shipping Administration in maintaining the authority of the master and eliminating crews' mass meetings, crews' committees, and other similar meetings or groups; that disputes will be settled through the regular machinery in existence under the collective bargaining agreements between the unions and the steamship operators; and that the unions' right to strike will be withheld for the duration of the war. Another such statement of policy, dated May 4, 1942, with other unions, is of like tenor, with the exception that it is provided that the existing collective bargaining agreements be continued "unless changed by mutual agreement between the War Shipping Administration and the unions". A third such statement of policy, dated May 12, 1942, between the National Maritime Union of America and the War Shipping Administration contains a like provision for modification of col-

lective bargaining agreements. There was also received in evidence a letter dated May 8, 1942, signed by Edward Macauley, assistant to the administrator, War Shipping Administration, and addressed to Mr. Joseph Curran, president National Maritime Union of America, in response to a letter from Mr. Curran, and giving answers to a list of questions which Mr. Curran had submitted with reference mainly to the effect of the statement of policy on certain union practices and policies.

This evidence, in our opinion, constitutes recognition by the unions of the status as United States employees of seamen on vessels owned by the United States. The stipulation of Article 3 (d) of the service agreement that "the Master shall be an agent and employee of the United States" was as effectually brought home to the plaintiff through his duly authorized representatives, the officials of his union, as though he had signed the statement of policy himself. There is implied approval of this stipulation. The union agreed with the War Shipping Administration to a change in the provisions of the collective bargaining agreements fixing their duration and to restrictions on the activities of the crews at sea not contained in those agreements. It cannot be said that in this matter the War Shipping Administration was acting on behalf of the steamship companies. It was the other way around. The War Shipping Administration was the principal, the companies the agents; and, in effect, the War Shipping Administration took over the collective bargaining agreements, substituted itself as a party in the place of the steamship companies, and the unions acquiesced. House Report 107, which accompanied Public Law 17, 78th Congress, speaks of "the adoption

of the collective bargaining agreements'' by the Administrator (1943 A. M. C. 618).

As stated, the trial judge left to the jury the question of employer-employee relationship as one of fact. The propriety of that submission is not defended here, and it seems to be agreed by both parties that the question is one of law to be determined by the court. Of the correctness of this view we think there can be no doubt. The construction and effect of the service agreement are, of course, for the court. There is no issue of de facto control, and we think that nothing in the evidence affects the conclusion that under the service agreement the defendant was not authorized to employ the master or crew of the vessel or to exercise any authority over them or to assume any control over the vessel itself while at sea.

Plaintiff's reliance on Brady v. Roosevelt S. S. Co., supra, is, in our opinion, not warranted. That case did not present the question whether a seaman was an employee of the defendant steamship company. It was not brought under the Jones Act, but was an action to recover damages for the death of a customs inspector resulting from injuries sustained while boarding a vessel owned by the United States Maritime Commission and operated for it under a contract covering that and other vessels. The accident occurred in June, 1938, and was caused by the breaking of a rung of the ladder which the deceased was climbing. At the time of the injury the vessel was docked at a pier in New York City. Suit was brought in the New York Supreme Court and removed to the federal court.

We have already called attention to important differences in the contracts involved in the two cases, and to these we should add that, so far as appears, the con-

tract in the Brady case contains no provisions similar to those of Article 3A (d) of the service agreement here. There was no contention that the seamen on the vessel were employees of the United States. Apart from that, the questions for decision were totally different. This case turns on the defendant's contention that the plaintiff was not in its employ and that it did not commit the tort which caused the plaintiff's injury. In the Brady case the tort was assumed to be that of the defendant, and that matter was not an issue before the Supreme Court. The only question decided was upon the validity of the defendant's contention that the plaintiff's remedy was not against it, but against the United States or the Maritime Commission by libel *in personam,* because the Suits in Admiralty Act (41 Stat. 525, 46 U. S. C. §§ 741, 742) so provided, and because, as the defendant claimed, the Maritime Commission, under the terms of its contract with the agent, would ultimately have to pay the judgment and was therefore the real party in interest. The Circuit Court of Appeals had taken that view, relying on *Emergency Fleet Corp. v. Lustgarten,* 280 U. S. 320, 74 L. ed. 451, 50 S. Ct. 118, and ordered the complaint dismissed, 128 F. (2d) 169. But, on certiorari, the Supreme Court, in an opinion by Mr. Justice Douglas, reversed. The Lustgarten case was overruled, "so far as it would prevent a private operator from being sued under the circumstances of this case". The court said that "the agent, because he is agent, does not cease to be answerable for his torts", and that Congress did not intend, by passing the Suits in Admiralty Act, to withdraw the right to sue the agent for his torts. It was further held that, even assuming the existence of the asserted agreement for exoneration, if the plaintiff had a cause of action against the defendant "it is

682

difficult to see how she could be deprived of it by reason of a contract" between defendant and the Maritime Commission. "The question", the court said in distinguishing other cases, "is not whether the Commission had authority to delegate to respondent responsibilities for managing and operating the vessel as its agent. It is whether respondent can escape liability for a negligent exercise of that delegated power if we assume that by contract it will be exonerated or indemnified for any damages it must pay."

It is apparent, therefore, that the Brady case does not touch the question with which we are here dealing and does not control our decision.

■ Before discussing decisions of the lower courts we think it well to consider Public Law 17, 78th Congress, which, as we have said, the plaintiff asserts is controlling. Section 1 of the Act provides in part:

"That (a) officers and members of crews (hereinafter referred to as 'seamen') employed on United States or foreign flag vessels as employees of the United States through the War Shipping Administration shall, with respect to (1) laws administered by the Public Health Service and the Social Security Act, as amended by subsection (b) (2) and (3) of this section; (2) death, injuries, illness, maintenance and cure, loss of effects, detention, or reparation, or claims arising therefrom not covered by the foregoing clause (1); and (3) collection of wages and bonuses and making of allotments, have all the rights, benefits, exemptions, privileges, and liabilities, under law applicable to citizens of the United States employed as seamen on privately owned and operated American vassels. * * *

"Any claim referred to in clause (2) or (3) hereof shall, if administratively disallowed in whole or in part, be enforced pursuant to the provisions

of the Suits in Admiralty Act, notwithstanding the vessel on which the seaman is employed is not a merchant vessel within the meaning of such Act.

\* \* \*

"When used in this subsection the term 'administratively disallowed' means a denial of a written claim in accordance with rules or regulations prescribed by the Administrator, War Shipping Administration."

It may first be observed that the fact that Congress considered it advisable to pass remedial legislation of this kind is itself an argument against the plaintiff's position that seamen "employed upon United States or foreign flag vessels as employees of the United States through the War Shipping Administration" are also employees of general agents operating under Service Agreement GAA 4-4-42; for, if that be true, no legislation was necessary in order to enable such seamen to sue the agent for its torts, since they already had that right under the Jones Act. That is a conclusion which may safely be drawn from the decision in the Brady case, which was decided before Public Law 17 was passed, and was brought to the attention of the Congress in the report of the committee which accompanied the bill. House Report 107, 1943 A. M. C. 611.

It is our opinion, however, that it was not the purpose of Public Law 17 to give a remedy against steamship companies who are agents of the War Shipping Administration. Section 1 does not mention agents. The rights which it declares that seamen in the employ of the United States shall have are the rights "applicable to citizens of the United States employed as seamen on privately owned and operated American vessels." What are those rights under the Jones Act? Broadly

684

speaking, they consist in the right of the seaman or his personal representative to sue the employer for negligence causing injury or death. But, since the agent under the service agreement in question is not the seaman's employer, and, since, indeed, the very law upon which the plaintiff relies deals in express terms with employees of the United States, it follows that the Act was not intended to create or declare rights or remedies against the agent. On the other hand, since the seamen are employees of the United States and are accorded by the Act the same rights they would have if privately employed, the clear purpose of Section 1 is to enable them to enforce rights given by the Jones Act against their employer, the United States, or the War Shipping Administration, "pursuant to the provisions of the Suits in Admiralty Act." If it be said that this right already exists it may be answered that this is true only if a vessel is a merchant vessel or a tug boat (46 U. S. C. A. § 742), and at least one of the purposes of Public Law 17 was to remove "confusion and inequities" resulting from this state of the law and other conditions. House Report 107, 1943 A. M. C. 617. This is made clear in the following passage from the House Report (1943 A. M. C. p. 616):

"Seamen employed as Government employees on vessels owned by or bareboat-chartered to the War Shipping Administration are sometimes precluded from enforcing against the United States the rights and benefits in case of death, injury, illness, detention, and so on that would be available to them if employed by private employers, except under the Suits in Admiralty Act. If they were private employees, rights to redress for death, injury, or illness could be prosecuted under the Jones Act and the general maritime law. These same rights may be asserted against the United States as the employer

under the Suits in Admiralty Act providing the vessel involved is a merchant vessel. In case of public vessels the seaman must rely upon the Administrator's policy for compensation recognizing contractual liability which this legislation recognizes. Present-day operating conditions often make uncertain whether the vessel is a merchant or a public vessel. As a consequence the aforementioned rights of such seamen are frequently in doubt. In addition to these rights which, at times, are uncertain for the reasons mentioned, the seamen who are employees of the United States probably have rights under the United States Employees' Compensation Act in the event of injury or death. Such compensation benefits are not presently enjoyed by seamen under private employment. Thus vital differences in these rights are made to depend upon whether the seaman happens to be employed aboard a vessel time-chartered to the War Shipping Administration or owned by or bareboat-chartered to the War Shipping Administration. Since seamen constantly change from one vessel to another, their rights for death, injury, or illness also constantly change, depending upon the relationship of the War Shipping Administration to the vessel. This fluctuation and lack of uniformity of rights leads to dependency of vital rights upon chance with a result of confusion and inequities. The bill is designed to remove this confusion and these inequities.''

Other statements in the report leave the intention of Congress free from doubt. We quote from the report, the references being to 1943 A. M. C.:

''They (the seamen) will continue to have the right of indemnity through court action for injury resulting from unseaworthiness of the vessel or defects in vessel appliances, and they (and their dependents) will have the right to action under the Jones Act (1920) for injury or death resulting from negligence of the employer. Such seamen will have

the right to enforce claims for these benefits according to the procedure of the Suits in Admiralty Act" (p. 606).

"They are not to be covered under the United States Employees' Compensation Act because they and their dependents have the right to sue for indemnity or damages under the Jones Act in case of death or injury" (p. 607).

"Except in rare cases the ships themselves are being operated as merchant vessels, and are therefore subject to the Suits in Admiralty Act. Granting seamen rights to sue under that act is therefore entirely consistent with the underlying pattern of the measure" (p. 607).

"Under section 1 officers and members of crews employed on vessels by or on behalf of the United States through the War Shipping Administration are, for the purpose of determination of the rights and benefits of such seamen and their dependents or beneficiaries, referred to those provisions of statutory and general maritime law which are applicable to seamen in private employment" (p. 621).

"The various rights and remedies under statute and general maritime law with respect to death, injury, illness, and other casualty to seamen, have been rather fully set forth hereinabove. Under clause 2 of section 1 (a) these substantive rights would be governed by existing law relating to privately employed seamen. *The only modification thereof* arises from the remedial provision that they shall be enforced in accordance with the provisions of the Suits in Admiralty Act. *This procedure is appropriate in view of the fact that the suits will be against the Government of the United States*" (p. 623; italics added).

Counsel for the plaintiff call attention to other passages from the report which are claimed to support their construction of the Act. Considered apart from the context, some of the language used seems to carry

that interpretation.  But, when the report is read in its entirety, and, in view of the repeated statements of the committee, as well as the express provision of Section 1 itself, that the rights granted are to be enforced according to the Suits in Admiralty Act, a different conclusion is compelled.  We will consider, for example, a portion of the report (1943 A. M. C. 620) quoted in the brief of plaintiff, with emphasis upon the following sentence:

> "All of these rights for which court action lies, although maritime in nature, may be enforced either in Federal or State courts."

This is followed by a statement of the nature of the seaman's rights and remedies under the Jones Act, and the final sentence quoted by counsel reads:

> "In addition to these peacetime remedial provisions, additional benefits for war conditions are now provided to all seamen whether private or Government employees under the decisions of the Maritime War Emergency Board."

We think that counsel's reliance on this language arises from the failure to take note of the particular phase of the subject which the committee was considering in this portion of the report.  The committee was not there engaged in an interpretation or explanation of the meaning of, or objects sought to be achieved by, Section 1 of the Act.  On the contrary, the language quoted by counsel is part of a discussion of the rights under existing law of a seaman *privately employed*— the right to maintenance and cure, wages, food and lodging, hospitalization, etc.  This is made entirely clear by the sentence immediately preceding the language quoted in the brief.  It reads:

> "A seaman *privately employed* is also entitled to indemnity for injury sustained by reason of the

unseaworthiness of the ship or a defect in her appliances or equipment'' (italics added).

It is apparent that in this section of the report the committee was enumerating the rights under existing law of seamen in private employment (as well as certain remedial wartime policies which the War Shipping Administration had put into effect) as a background for the explanation of the purposes intended to be accomplished by the proposed legislation, which follows under the heading ''The Provisions of Section 1'' (p. 621). And it is in reference to these matters that the committee used the language above quoted by us:

"The various rights and remedies under statute and general maritime law with respect to death, injury, illness, and other casualty to seamen, have been rather fully set forth hereinabove" (p. 623).

In a word, the committee said in effect:

"These are the rights which seamen privately employed now have. Our purpose is to give the same rights to seamen employed by the United States, to be enforced against the United States through the procedure of the Suits in Admiralty Act."

An additional reason for the view we take is the retroactive provision of Public Law 17. Congress might well by statute provide a remedy against the United States and make it available in the case of an injury occurring before the statute was enacted; but it is difficult to believe that Congress would undertake to create a retroactive liability against private individuals or corporations. See Cooley's Constitutional Limitations (8th ed.) 770; 16 C. J. S., Constitutional Law, 861, § 417. We can find no such intention expressed or implied in Section 1 of Public Law 17.

The fact that Section 1 of the Act does not deal with the liability of agents is further indicated by the following passage from the report:

"Subsection (j) of section 3 would make it clear beyond controversy that the War Risk Insurance Act includes authority to provide insurance protection for agent operators as well as owners or charterers of vessels. The recent determination of the Supreme Court of the United States in Margaret M. Brady vs. Roosevelt Steamship Company, Inc. (1943 A. M. C. 1), holds that there is such an independent liability in certain cases." (1943 A. M. C. 611)

The clear implication of the foregoing is that the committee was content to leave the matter of agents' liability to the courts.

We do not mean to suggest that the purpose of the law was to grant to agents immunity from suit for their own torts, but simply that it leaves the question of the agents' liability untouched. It does not purport to create between the seamen and general agents of the War Shipping Administration a relationship of employer and employee, which, but for the Act, would not exist, nor to impose upon such agents liability for a tort which they did not commit. The whole purpose and intent of Section 1, in our opinion, was to create and declare in favor of seamen employed by the United States rights and remedies against the United States.

In addition to the Brady case, counsel for the plaintiff have cited *Gay v. Pope & Talbot, Inc.*, 47 N. Y. S. (2d) 16, 1944 A. M. C. 855 (March 6, 1944); *McCormick v. Moore-McCormack Lines, Inc.*, 54 F. Supp. 399, 1943 A. M. C. 1422, D. C. E. D. Pa.; *Schaller v. Matson Nav-*

*igation Co.,* 43 N. Y. S. (2d) 566, City Ct. of N. Y., Special Term; and *Lewis v. U. S. Nav. Co.,* supra.

The Gay case was an action by a seaman to recover damages for personal injuries under the Jones Act against a general agent operating under the same form of contract as that involved in this case. The grounds of negligence are not stated in the opinion. The case came before the court on defendant's motion to dismiss the complaint based on the claim that Public Law 17 provides an exclusive remedy against the United States. The court denied the motion, held that the remedy provided by Public Law 17 is not exclusive, and that, under the Brady case, the agent is liable for his own torts. With these conclusions we are in accord, but, for reasons already stated, we do not agree with the implication of the decision that the seaman was an employee of the agent and entitled to sue under the Jones Act.

In the Schaller case there is a very brief opinion denying a motion to dismiss. The court said that "it is conceded that the defendant is the owner of the vessel upon which plaintiff was employed", and that, although the defendant "operates the vessel in behalf of the United States · Government under a general agency agreement, it is subject to suit, under the Jones Act, for its torts" (citing the Brady case). The concession referred to would seem to distinguish the case.

Three cases are reported under the title, *McCormick v. Moore-McCormack Lines, Inc.,* supra. They were actions to recover for personal injuries, for maintenance and cure, and for War Risk Insurance benefits. On a motion for summary judgment the court held that under the Brady case the seaman had a right of action against the agent for its torts, and, in the discussion

of the plaintiff's claim for maintenance and cure, said that "even under the general agency agreement the operator became owner *pro hac vice* and accordingly became subject to the same liability."

None of these cases refers to the provisions of the agency agreement that the master shall be an employee and agent of the United States, and all seem to proceed upon the theory that, because the Supreme Court has held that an agent may be liable for its own torts, notwithstanding the provisions of the Suits in Admiralty Act, every agent, irrespective of the terms of the agency agreement and of the relationship between the agent and the crew of a vessel of the United States, is liable for personal injury to a seaman sustained aboard the vessel and caused by the negligence of someone. As we have already indicated at some length, we are unable to accept this review.

We have discussed the Lewis case. The special ground on which the court sustained liability there is not present here, and the opinion of the court indicates that, but for the element of undisclosed agency, a different decision would have been rendered.

We should also mention *Carroll v. United States,* 133 F. (2d) 690, C. C. A. 2d, decided February 9, 1943, after the decision in the Brady case. This was a libel in the United States District Court by a seaman against the United States and The Waterman S. S. Agency, Ltd., for personal injuries suffered by the libellant while a steward on board the S. S. "Gallant Fox", owned by the United States and operated by the agency under the Panamanian flag. The accident occurred December 4, 1941. The libel was filed under the Suits in Admiralty Act, also under the Jones Act and general maritime law. The opinion shows that the contract

between the United States and the agent was not before the court. The court held that since the decision in the Brady case the libellant could sue the agency under the Jones Act. The questions involved in the instant case were not discussed and do not appear to have been involved.

See, also, *Burkholder v. United States,* 56 F. Supp. 106, 1944 A. M. C. 944, D. C. E. D. Penn. (June 9, 1944), a libel in personam against the United States and the agent, the owner of the vessel, which was chartered to the United States. The question of the agent's liability, however, was not discussed.

We turn now to decisions which sustain the defendant's position. *Murray v. American Export Lines, Inc.,* 53 F. Supp. 861, D. C. S. D. N. Y. (December 10, 1943), holds, in a Jones Act case, that the agent is not liable for the negligence of a seaman who was a fellow servant of the plaintiff. This conclusion was reached after a consideration of the material differences between the service agreement, GAA 4-4-42, and the agency contracts involved in the Brady case and *Quinn v. Southgate Nelson Corp.,* supra. Some of these differences we have already pointed out, but, in addition, the court (which had before it copies of the agreements in those cases) called attention to their provision that "any agents selected or appointed by the Managing Agent shall be solely the agents of said Managing Agent and not, in any respect, the agents of the Owner". Referring to the statement in the Brady case that "the rights of principal and agent inter se are not the measure of the rights of third persons against either of them for their torts", the court said:

"While the last-quoted sentence is true, nevertheless the contract between principal and agent

may show who is in control of the operation of the vessel, whose orders the members of the crew are required to obey and who is their employer. From all this it is possible to conclude who is liable if a member of the crew negligently injures a fellow crew member.''

The court concluded:

''Plaintiff does not claim that the injury to plaintiff was due to any defect in machinery or appliance or to any failure of defendant to inspect the vessel or to arrange for the proper maintenance of the vessel. The negligence alleged is that of a fellow member of the crew, over whom the defendant exercised no direction or control. It is clear that the negligence of the crew member, if any, is chargeable to the United States.''

*Pedersen v. Stockard S. S. Corp.*, 268 App. Div. 992, 51 N. Y. S. (2d) 675, 1945 A. M. C. 23 (December 6, 1944), an action by a longshoreman to recover damages for personal injury sustained while handling cargo, follows the decision in the Murray case, and holds that, if the accident happened not because of defective appliances but because of negligence of the crew, the defendant agent was not responsible.

*Baker v. Moore-McCormack Lines, Inc.*, 57 F. Supp. 207, D. C. N. D. Cal., S. D. (September 29, 1944), is an opinion on motion to remand in a Jones Act case brought in the state court and removed to the federal court. The motion was denied because the agent was not the employer of the seaman and the prohibition against removal in the Jones Act was therefore not applicable. The court said:

''If plaintiff wishes to follow the Jones Act against his employer, the United States, he may do so under certain conditions pursuant to the

provisions of the Suits in Admiralty Act, 46 U. S. C. A. § 741 et seq., and by virtue of Public Law 17, 50 U. S. C. A. Appendix § 1291, irrespective of whether the vessel is a merchant vessel or a public vessel. However, the suit against defendant Moore-McCormack Lines, Inc., cannot be under the Jones Act, inasmuch as the defendant did not man the vessel and was not plaintiff's employer.''

*Conlon v. Hammond Shipping Company Ltd.*, 55 F. Supp. 635, 1944 A. M. C. 443, D. C. N. D. Cal., S. D. (January 8, 1944), was a libel by a seaman for wages, maintenance and cure, against a general agent. The court rendered a brief opinion on exceptions to the libel, as follows:

"Respondent, being neither the owner (nor owner *pro hac vice*) nor master of the vessel in which libellant served as seaman, is not suable in Admiralty for wages, maintenance or cure. Everett vs. United States, 284 Fed. 203. By the 'Service Agreement' between the United States, as owner, and respondent, as 'General Agent', respondent was the agent of the United States. Murray vs. American Export Lines, Inc. (S. D. N. Y.), Civil 21-401, 1943 A. M. C. 1426.

"The Suits in Admiralty Act (46 U. S. C., sec. 741 et seq.), affords libellant adequate remedy against the owner of the vessel."

See, also, *Militano v. United States*, 55 F. Supp. 904, 1944 A. M. C. 1250, D. C. S. D. N. Y. (December 3, 1943); *Nielsen v. American President Lines, Ltd.*, 1944 A. M. C. 1169, S. Ct. N. Y., N. Y. County, 50 N. Y. S. (2d) 249 (August 23, 1944); *Fox v. Alcoa S. S. Co.*, 143 F. (2d) 667, C. C. A. 5, 1944 A. M. C. 893 (July 7, 1944).

From this review of pertinent decisions it is apparent that there is no decided weight of authority on

this important question, which ultimately must be determined by the Supreme Court of the United States. Those courts which would sustain liability in a case of this kind seem to us to have attached unwarranted implications to the decision in the Brady case. The opinion in that case is carefully guarded, and the decision limited to the question whether a private operator may be sued "under the circumstances of this case" (317 U. S. 578). There is nothing, as we view it, to indicate that it should govern the rights of seamen in the employ of the United States on vessels owned by the United States. There may, of course, be circumstances under which the general agent for the War Shipping Administration would be liable to a seaman, or to others, as, for example, for injury resulting from negligence in failing to equip the vessel properly, or negligence in the selection of the master or a member of the crew. But that would not be because the seamen are in the employ of the agent, nor because of any general principle of liability arising from the fact of agency, but it would be because of the violation of a particular duty toward the injured person which the agent has assumed.

■ We find no such basis of liability in this case. The defendant was not responsible for a negligent order of the boatswain which sent the plaintiff into a place of danger. There is no evidence that the vessel was not properly equipped when it started on its voyage. It appears that the electric light bulb which usually lighted the locker room where the plaintiff was injured had burned out or been removed a short time prior to the accident, and that the guard chain used to protect the hatchway through which the plaintiff fell, had been removed a day or two before on order of the master.

The defendant had no control over these events and no means of preventing their occurrence. As an agent whose duty it was merely to procure the master and crew for employment by the United States, it was not responsible for their conduct to the plaintiff (Restatement, Agency, § 79, comment a); and, since plaintiff was not an employee of the defendant, he could in no event sue the defendant under the Jones Act.

■ One other contention of the plaintiff should be briefly noticed. The defendant in its answer admitted "that at the time of the accident alleged it was operating the Liberty ship S. S. Mark Hanna for and on behalf of the United States of America, represented by the War Shipping Administration under a written Agency Agreement prescribing and limiting the duties, authority and functions of this defendant." This is said to be "express recognition that the crew were the agents" of the defendant. But the defendant denied allegations of the complaint that it managed or controlled the Mark Hanna and that plaintiff was employed by it. The defendant, therefore, cannot be said to have gone further than to admit operation of the vessel to the extent authorized by the agreement and to the exclusion of any control of the vessel or authority over the crew. Upon this theory of the meaning of the pleadings the case seems to have been tried.

For the reasons hereinabove stated the judgment is reversed and the cause remanded to the court below with directions to enter judgment for the defendant notwithstanding the verdict.