Argued March 4; reversed and remanded April 6; rehearing
denied May 18, 1948

## FINK *v.* SHEPARD STEAMSHIP CO.

192 P. (2d) 258

*Erskine B. Wood,* of Portland, argued the cause for appellant. With him on the brief were Wood, Matthiessen & Wood, of Portland.

*Edwin D. Hicks,* of Portland, argued the cause for respondent. With him on the brief were Green & Landye, Nels Peterson, and Thomas H. Tongue III, of Portland.

H. G. Morison, Acting Assistant Attorney General, of Washington, D. C.; Henry L. Hess, United States Attorney, of Portland; J. Frank Staley and Leavenworth Colby, Special Assistants to the Attorney General, Attorneys for the United States, of Washington, D. C., filed a brief for the United States as amicus curiae, urging reversal.

Lasher B. Gallagher, of Los Angeles, filed a brief as amicus curiae, urging reversal.

Before ROSSMAN, Chief Justice, and LUSK, BELT, KELLY, BAILEY and BRAND, Justices.

LUSK, J.

This case, like *Hust v. Moore-McCormack Lines,* 328 U. S. 707, 90 L. ed. 1534, 66 S. Ct. 1218 (reversing 176 Or. 662, 158 P. (2d) 275), is concerned with the rights of seamen to recover for injuries sustained while employed on United States vessels as employees of the United States. There is but one point of difference: Hust was injured a few days before March 24, 1943, the effective date of Public Law 17 (78th Cong., 57 Stat. 45), otherwise known as the Clarification Act; while the plaintiff Fink was injured on August 2, 1943, after the act became effective.

Fink recovered a judgment based on the verdict of a jury from which the defendant has appealed. The principal question for decision here, as in the Hust case, is whether the plaintiff is entitled to maintain his action under the Jones Act, Act of March 4, 1915, 38 Stat. 1185, as amended June 5, 1920, 41 Stat. 1007 (46 U. S. C. 688), with right to trial by jury, or whether his sole remedy is in the federal court against the United States under the Suits in Admiralty Act, 41 Stat. 525 (46 U. S. C. 741). The question was raised on the trial by motions for nonsuit and a directed verdict, and later by motion for judgment notwithstanding the verdict, and the court's rulings denying these motions are assigned as error.

Plaintiff was an able-bodied seaman on the S. S. George Davidson, a Liberty ship owned and operated by the United States through the War Shipping Administration. The defendant steamship company managed certain business of the vessel as General Agent for the Administration under a General Agency Service Agreement designated "GAA 4-4-42," identical with

that involved in the Hust case. Plaintiff was injured while the vessel was at sea as the result, he claims, of the negligence of his superior officer in ordering him, unaided, to dump overboard the contents of an excessively heavy garbage can at a time when a strong sea was running.

It is the contention of the plaintiff that the Hust case, which held that a seaman injured under like circumstances was entitled to sue and recover from the agent under the Jones Act in a state court, with the right to trial by jury, controls the decision here. The defendant, on the other hand, asserts, first, that this case presents a question which the Supreme Court of the United States expressly declined to decide in the Hust case, namely, the effect of the Clarification Act upon seamen's remedies with respect to injuries incurred after March 24, 1943, and that the purpose of that act was to remit the injured seaman for vindication of his rights to a suit under the Suits in Admiralty Act against the United States in the federal court; and, second, that in any event, the Hust decision has been overruled by the later decision in *Caldarola v. Eckert*, 332 U. S. 155, 91 L. ed. 1566, 67 S. Ct. 1569. The ultimate position of the defendant is supported by a brief filed by the United States as *amicus curiae*, the reasoning in which, however, is very different in some respects from that of counsel for the defendant.

For a solution of these questions a careful examination of the ground of decision by the Supreme Court of the United States in the Hust case is necessary. As a background for that examination we start with a brief statement of what this court held when the case was before it. From an analysis of the terms of the agency agreement and a consideration of the

evidence relating to the functions actually performed by the agent, we reached the conclusion that Hust was not an employee of the agent, but exclusively of the Government. It followed, in our view, that the remedy given by the Jones Act, which was created only in favor of an employee against his employer for the latter's negligence, was not available to Hust in an action against Moore-McCormack. In reaching that conclusion we applied the familiar common law test for determining whether one is an employee of another, namely, "whether the latter has the right to order, direct and control the former in the performance of the work" (176 Or. 670). We held, further, that the General Agent was not owner of the vessel *pro hac vice*. There the opinion might have stopped but for the argument of the plaintiff that Congress had recognized the status of seamen on Government-owned vessels as employees of the agents in section 1 of the Clarification Act, hereinafter set out. Upon this point this court held that the Act did not deal with the liability of agents. We said:

"We do not mean to suggest that the purpose of the law was to grant to agents immunity from suit for their own torts, but simply that it leaves the question of the agents' liability untouched. It does not purport to create between the seamen and general agents of the War Shipping Administration a relationship of employer and employee, which, but for the Act, would not exist, nor to impose upon such agents liability for a tort which they did not commit. The whole purpose and intent of Section 1, in our opinion, was to create and declare in favor of seamen employed by the United States rights and remedies against the United States." (176 Or. 689).

Entertaining these views, it became unnecessary for us to express an opinion as to whether the so-called

retroactive provision of the Clarification Act, hereinafter set forth, upon which the decision of the Supreme Court of the United States to some extent turned, gave Hust an election to pursue a remedy which we had already held was never available to him.

The Hust case was decided in the Supreme Court of the United States by a bench of seven judges. It was a four to three decision. The opinion of the court was written by Mr. Justice RUTLEDGE and concurred in by Justices BLACK, DOUGLAS and MURPHY. In addition, Mr. Justice DOUGLAS wrote a concurring opinion in which Mr. Justice BLACK joined. A dissenting opinion by Mr. Justice REED was concurred in by Justices FRANKFURTER and BURTON.

The opinion of Mr. Justice RUTLEDGE proceeds upon the following grounds: Prior to 1942, when the Government took over practically the entire merchant marine, seamen employed on vessels of the United States operated by private companies were even more favorably situated than privately employed seamen. The latter had their remedy under the Jones Act, and their rights under general maritime law and enforcible in admiralty, or by various forms of proceeding elsewhere. But seamen on Government vessels had not only their exclusive remedy against the Government or the appropriate governmental corporation under the Suits in Admiralty Act, but as well their rights under maritime law against the private company operating the vessel as agent for the Government, including the right to sue the agent under the Jones Act. This latter right was one of the effects of the decision in *Brady v. Roosevelt S. S. Co.,* 317 U. S. 575, 87 L. ed. 471, 63 S. Ct. 425. The Brady case had overruled the decision in the Lustgarten case, reported under the name of *Johnson v. Fleet Corp.,*

280 U. S. 320, 74 L. ed. 451, 50 S. Ct. 118, that the remedy given by the Suits in Admiralty Act was intended to preclude suit against the agent. But to hold that Hust could not sue the agent under the Jones Act would be to restore the rule of the Lustgarten case and to overrule the Brady case. There must be more than mere implication for the destruction of settled rights. The conjunction of the acts of the Government in taking over the merchant marine, with the Suits in Admiralty Act, is not sufficient basis for holding that it was the intention of Congress, or Congress and the President, to deprive seamen on United States vessels of any of the rights enumerated. This is especially true in view of uncertainties and possible hardships which would result from such a decision. While Hust, as the Supreme Court of Oregon held, may have been technically an employee of the United States, yet, within the spirit of the Jones Act, the agent was sufficiently his employer to be suable under that act, citing *Labor Board v. Hearst Publications,* 322 U. S. 111, 88 L. ed. 1170, 64 S. Ct. 851. The technical relation of employer and employee had been shifted from the General Agent to the Government "for purposes relevant to ultimate wartime control of marine employees, without at the same time disrupting their normal applicable rights and remedies." It is a fallacy to say that the case is governed by the common law rules of private agency, more particularly the test of ultimate control over the acts of the alleged employee.

This view, the opinion continues, is confirmed by the so-called retroactive or elective provision of section 1 of the Clarification Act, which reads:

"Any claim, right, or cause of action of or in respect of any such seaman accruing on or after

October 1, 1941, and prior to the date of enactment of this section may be enforced, and upon the election of the seaman or his surviving dependent or beneficiary, or his legal representative to do so shall be governed, as if this section had been in effect when such claim, right, or cause of action accrued, such election to be made in accordance with rules and regulations prescribed by the Administrator, War Shipping Administration.''

The fact that Congress has given this election to seamen whose causes of action arose before the Clarification Act became effective, shows that the Suits in Admiralty Act was not intended to be the exclusive remedy in such cases. Otherwise there would be no election. Although Congress did not enumerate the specific rights which it considered seamen to have prior to the Clarification Act, and after the industry's transfer to Government control, the intent was clear to preserve all such rights and remedies as may have remained in existence unaffected by the transfer, including the rights and remedies provided by the Jones Act. This result accords with various provisions of the General Service Agreement. The Clarification Act in its prospective operation is not before the court, and no suggestion is made as to its effect on seamen's rights.

Mr. Justice Douglas, in his concurring opinion, concluded from an examination of the provisions of the General Service Agreement that the General Agent ''had a most substantial control over the operations of the vessels''; that it was in fact owner of them *pro hac vice,* and was ''therefore the employer and responsible for this personal injury claim.''

The dissenting opinion of Mr. Justice Reed denied liability of the General Agent for reasons substantially

the same as those which this court expressed. He called attention to the Supreme Court's holding in *Robinson v. Baltimore & Ohio R. Co.*, 237 U. S. 84, 94, 59 L. ed. 849, 35 S. Ct. 491, that "Congress used the words 'employe' and 'employed' in the statute (i. e. the Jones Act) in their natural sense, and intended to describe the conventional relation of employer and employe." He said that under the agency contract the agent only managed certain matters connected with the ship for the United States, and made the crew available to the Master, a United States agent, for employment by the Master for the account of the United States. "Such a contract makes the United States the employer under the Merchant Marine Act, not the Master and not respondent, the General Agent." (p. 740) Referring to section 2 of the Suits in Admiralty Act, which gives to employees of the United States upon merchant vessels of the United States a right of action against the vessel to be enforced by a libel *in personam* in admiralty, without right to trial by jury, and to the doubts which sometimes arose when the War Shipping Administration became the operator of practically the entire merchant marine as to whether a particular vessel was a merchant vessel or not, he said:

"* * * Therefore to clarify this situation and to assure all 'employees of the United States through the War Shipping Administration' all 'rights' for 'injuries' applicable to seamen 'employed on privately owned and operated American vessels,' Congress enacted an act to clarify the law relating to functions of the Administration (the Clarification Act), and declared its purpose in no uncertain terms to grant the power to enforce these rights only through the Suits in Admiralty Act." (pp. 741, 742)

Of the retroactive provision of section 1 of the Clarification Act he said:

"As there might be instances where a seaman was an employee of the Administration but his boat was not a merchant vessel of the United States, the Clarification Act of March 24, 1943, was made retroactive to October 1, 1941. Probably other compensation for injuries may have existed prior to the enactment of this Act." (p. 744)

Mr. Justice Reed thought that the majority misconceived the effect of the Brady case. He took the view, as we had, that it did no more than to hold that actions could be maintained against agents of the United States at common law for the agent's own torts, and that a denial of Hust's right to sue the agent under the Jones Act did not restore the rule of the Lustgarten case. "We do not think the requirement that seamen, employees of the United States, must seek their remedy against their employer under the Suits in Admiralty Act has any relation to the Lustgarten or Brady cases." (p. 745) There was nothing to prevent Hust from suing the agent for its own tort, but he could not "hold respondent liable as employer for negligence of petitioner's fellow servants, of petitioner's superiors or the Master under the Merchant Marine Act." (p. 747)

" * * * There is here no 'disruption' of the normal and past relationship between seaman and employer. This Court errs, we think, in suggesting any seaman has been deprived of any right by the Clarification Act of 1943 under the construction of The Oregon Supreme Court. No seaman ever had a right of recovery under the Merchant Marine Act except against his employer. That the seaman still has.

"What the Clarification Act does and what it obviously was intended to do * * * was to continue the policy of requiring seamen who were

employees of the United States to continue to vindicate those rights through the Suits in Admiralty Act." (p. 748)

The minority took issue with the *pro hac vice* theory, saying:

" * * * But a charterer or owner *pro hac vice,* who is also an employer, is one who takes over 'the exclusive possession, command, and navigation of the vessel.' Reed v. United States, 11 Wall. 591, 600. That is a bareboat charter. Under the contract in this case, the respondent had no such authority. As we have pointed out above, and as the contract shows, he acted for the United States under its command and then only in certain matters not connected with actual navigation." (p. 747)

In the light of the foregoing analysis of the opinions in the Hust case, we will consider first the defendant's contention that that case has been overruled by *Caldarola v. Eckert,* supra. The plaintiff there was not a seaman but a longshoreman. He was not an employee of the defendants, the General Agents. The following statement of the facts is taken from the opinion of the court:

"The S. S. Everagra is owned by the United States and managed in its behalf by the respondents as General Agents. On January 27, 1944, the Everagra, docked in the North River, New York City, was being unloaded by a stevedoring concern, the Jarka Company. Jarka did the unloading under a contract with the United States, negotiated through the War Shipping Administration. One of its provisions was that 'the Administrator shall furnish and maintain in good working order all' necessary equipment. Caldarola, the petitioner, was an employee of Jarka. In the course of his work on the vessel he was injured. He brought this action in the New York courts against the respondents, claiming that his injury was caused by a defective boom

and that they were liable for failing in their duty as agents to maintain it in sound condition.''

The Supreme Court of the United States affirmed a judgment of the Court of Appeals of New York in favor of the agents. Under New York law liability in tort by the agents for Caldarola's injury would only arise where there is possession and control of premises on which injury occurs due to negligence in their maintenance. Hence, it became necessary to examine the terms of the General Service Agreement to determine as a question of federal law whether, on a fair reading of the contract, the agents were in possession and control of the S. S. Everagra. As to this the court said:

"" * * * The United States, as *amicus curiae,* submitted what we deem to be conclusive considerations against reading the contract so as to find the Agents to be owners *pro hac vice* in possession and control of the vessel. The consequences, to both the national and international interests of the United States, of such a construction would be too far-reaching to warrant such a forced reading merely in order to have a basis on which to build liability under the common law of New York. Serious issues affecting the immunity of government vessels in foreign ports as well as immunity from regulation and taxation by local governments would needlessly be raised. After all, the question is not whether petitioner may be compensated for his injury. Congress has made provision for that. Petitioner insists, in order to enable him to sue in the courts of New York, that the Agents are to be deemed, as a matter of federal law, owners of the vessel *pro hav vice* and, therefore, as a matter of state law, subject to the duties of such ownership under New York law toward business invitees. We reject this construction.''

The opinion then continues:

"Our previous decisions do not require it. Hust vs. Moore-McCormack Lines, supra, arose under the Jones Act (Act of March 4, 1915, 38 Stat. 1185, as amended, June 5, 1920, 41 Stat. 1007). We there held that under the Agency contract the Agent was the 'employer' of an injured seaman as that term is used in the Jones Act, and a seaman could therefore bring the statutory action against such an 'employer.' The court did not hold that the Agency contract made the Agent for all practical purposes the owner of the vessel. It did not hold that it imposed upon him, as a matter of federal law, duties of care to third persons, more particularly to a stevedore under employment of a concern unloading the vessel pursuant to a contract with the United States.

"Brady vs. Roosevelt Steamship Co., 317 U. S. 575, 1943 A. M. C. 1, is likewise remote from the issues decisive of this case. It merely held that the Suits in Admiralty Act, by furnishing an *in personam* remedy against the United States, did not free the Agent from liability for his own torts. The Brady case did not reach the 'different question' whether 'a cause of action' against the Agent had been established. 317 U. S. at 585. That is the precise question here, and more particularly, whether the contract created a relationship from which, under New York law, liability as to business invitees followed."

The opinion of the court was written by Mr. Justice Frankfurter and concurred in by the Chief Justice and Justices Reed, Jackson and Burton. Thus, the three justices who dissented in the Hust case became a part of the majority of the full court which decided the Caldarola case, while the four justices who constituted the majority in the Hust case all dissented on grounds which, to a large extent, formed the basis

of the prevailing opinions in the Hust case. They took emphatic issue with the majority's interpretation of the Brady case.

We are urged to declare that this decision overrules the Hust case because, contrary to what the majority of the seven-judge court then held, it determines, first, that, under the General Service Agreement, agents are not owners *pro hac vice* of Government vessels, and, second, that the Brady case merely held that the Suits in Admiralty Act did not free the agent from liability for his own torts.

Great stress was laid on the Brady decision in both reversing opinions in the Hust case, while the *pro hac vice* doctrine was the principal ground on which Mr. Justice Douglas thought that liability of the agent should be sustained. But we cannot say that the Hust case has been overruled because it has now been determined that a majority of the seven-member court misconceived the effects of the Brady decision, and that two justices erroneously thought that the agent was in possession and control of the vessel. All we can say is that two of the props of the Hust decision have been removed. The Supreme Court of the United States did not avail itself of the opportunity offered it to overrule its prior decision, but distinguished it.

While the basis on which the majority sustained liability in the Hust case is not clear to us, it was made sufficiently clear that the question was not governed by common law principles. With no statement by the court which rendered the decision that that view has been abandoned, it would be presumption on our part, under the circumstances, to say that the decision has been overruled.

Closely allied to the foregoing contention is the argument pressed upon us in the brief of the United

States in substance as follows: By the Caldarola case it is established that the agent is not the owner *pro hac vice* of the vessel, and does not possess, operate or control it. The general rule of law is that the employer is not liable for the negligent acts of his employee unless at the very time that the act is committed the latter is engaged in the service of the former. If he is not, and the employee at that time is performing services for someone else, then that other, not the general employer, is responsible for the consequences of the employee's negligent conduct. *Denton v. Yazoo & M. V. R. Co.*, 284 U. S. 305, 76 L. ed. 310, 52 S. Ct. 141; *Standard Oil Co. v. Anderson*, 212 U. S. 215, 53 L. ed. 480, 29 S. Ct. 252. And the question as to whose work is being performed is usually answered, as stated in the Anderson case, ''by ascertaining who has the power to control and direct the servants in the performance of that work.'' Conceding that, generally, for the purposes of the Jones Act, as the Hust case seems to hold, the master and crew of the S. S. George Davidson were employees of Shepard Steamship Company, still, at the time of the injury to Fink, they were not performing services for the defendant, but for the United States, which, through the War Shipping Administration, was operating the vessel and was in the exclusive possession and control of it.[1]

The legal principles relied on in the Government's brief are well settled. They have the sanction of the Supreme Court of the United States. In the Anderson

---

[1] The converse of this proposition is stated by the Circuit Court of Appeals for the 2d Circuit in Militano v. United States, 156 F. (2d) 599, which was decided after Hust and before Caldarola, and involved facts like those in the latter case. In sustaining liability of the agent the court said: "If the agent remains the employer sufficiently to be liable to members of the crew under the Jones Act, we think it cannot escape the duties of an owner *pro hac vice* in other respects."

case the court said regarding the reason of the rule of a master's liability for the negligence of his servant:

" * * * In substance, it is that the master is answerable for the wrongs of his servant, not because he has authorized them nor because the servant, in his negligent conduct, represents the master, but because he is conducting the master's affairs, and the master is bound to see that his affairs are so conducted that others are not injured. * * * The master's responsibility cannot be extended beyond the limits of the master's work. If the servant is doing his own work or that of some other, the master is not answerable for his negligence in the performance of it."

The Supreme Court applied these rules to the United States in the Yazoo case when it held that the railroad was not responsible for the negligence of a porter whom it employed and paid, but who, at the time the negligent act was committed, was engaged in loading United States mail into a mail car under the direction of a United States postal transfer clerk. This is the so-called lent servant doctrine.

As further support for its position the Government's brief calls attention to the provisions of Article 3A (d) of the General Service Agreement set out in the margin.[2] It is said to be the well-settled rule that

---

[2] The General Agent shall procure the Master of the vessels operated hereunder, subject to the approval of the United States. The Master shall be an agent and employee of the United States, and shall have and exercise full control, responsibility and authority with respect to the navigation and management of the vessel. The General Agent shall procure and make available to the Master for engagement by him the officers and men required by him to fill the complement of the vessel. Such officers and men shall be procured by the General Agent through the usual channels and in accordance with the customary practices of commercial operators and upon the terms and conditions prevailing in the particular service or services in which the vessels are to be operated from time to time. The officers and members of the crew shall be subject only to orders of the Master. All such persons shall be paid in the customary manner with funds provided by the United States hereunder."

the agent procuring the employment of others in such a manner is not responsible for the torts of such employees, and counsel for the Government cite § 79, Comment (a), Restatement, Agency, which reads:

> " * * * The agents so employed are the agents of the principal and not of the employing agent, who is not responsible to them for their compensation unless he so manifests, and is no more responsible for their conduct to third persons or to the principal than he is for the conduct of other agents of the principal, unless he is negligent in their selection."

However convincing these arguments might be in other circumstances, we think that they could be more appropriately and perhaps more effectively addressed to the Supreme Court of the United States. For, in the opinion of Mr. Justice Rutledge in the Hust case, the test of ultimate control over the seaman in the performance of his work, which this court thought was the determining factor, was rejected. It was said to be a "fallacy" to assume that "the case would be controlled by the common law rules of private agency" (328 U. S. 724). And the very section of the Restatement of Agency upon which counsel rely was cited by this court in support of its conclusion that the agent was not responsible for the negligence of the master, the boatswain, or other seamen on the vessel (176 Or. 696). The Supreme Court of the United States, however, did not mention the rule of the Restatement and obviously considered it to be without bearing on the question.

But it is argued by the Government that the instant case is to be distinguished from the Hust case for two reasons, first, because of an "admission" in the answer in the Hust case that the defendant "operated" the vessel, and, second, because the Hust case did no more

than decide that the injured seaman was free to bring his action under the Jones Act and did not hold that the agent was vicariously responsible for the tortious acts of the master or boatswain, which is the negligence alleged here. We cannot agree. The admission in the answer in the Hust case was construed by this court to go "'no further than to admit operation of the vessel to the extent authorized by the agreement and to the exclusion of any control of the vessel or authority over the crew" (176 Or. 696). The alleged admission was not referred to in any of the opinions of the Supreme Court of the United States, and we can find nothing in the prevailing opinions which would indicate that it was relied on as a basis for decision. The other claimed point of difference does not exist, for the negligence in the Hust case was of precisely the same character as that alleged here, namely, the negligence of the master, the boatswain, and perhaps other members of the crew (176 Or. 695). The Supreme Court of the United States so treated the case. The problem was one of vicarious responsibility (328 U. S. 712, 713, 724).[3]

---

[3] It is said in the government's brief: "For reasons not susceptible of precise analysis the Rutledge opinion concluded that suit under the Jones Act was available to plaintiff and the cause was remanded for further proceedings (328 U. S. at 734)." To the foregoing the following footnote is appended: "Settlement was subsequently authorized by the United States without the case being returned to the Supreme Court. Accordingly, it was not until Caldarola that it was known that the new five judge majority regarded the opinion of the old four judge majority as turning on the concession that Moore-McCormack was *operating* the vessel." On the remand of the Hust case two questions were presented by Moore-McCormack: (1) That the Supreme Court decision did not determine the question of the agent's liability; (2) that the verdict was excessive. We held adversely to Moore-McCormack on the first question and sent the second question to the Circuit Court for decision. Hust v. Moore-McCormack Lines, Inc., 176 Or. 662, 177 P. (2d) 429. There is not a word in the Caldarola opinion that even remotely suggests that the five-judge majority in that case thought that the decision in the Hust case turned on the "concession".

Furthermore, no distinction can be validly drawn between this and the Hust case based upon the functions actually performed by the agents. In the latter case there was a claim that the evidence showed *de facto* control of the vessel. We held against that contention, and the majority opinion of the Supreme Court of the United States does not take issue with our conclusion. Here the case against *de facto* control is, if anything, stronger. Not only is it shown that the agent was limited to the performance of certain shoreside functions not connected with the navigation of the vessel and in large part subject to supervision of the War Shipping Administration, but some of the duties performed by Moore-McCormack in the Hust case were not performed by Shepard in this case but by American President Lines, appointed berth agent, which performed "port-services," consisting principally of arranging for the handling and loading of cargo. Nor can we agree with the finding of the learned circuit judge, who heard the case below, that the evidence shows that Shepard had the power of discharging the seamen. The evidence on this point is to the effect that when agents discharged seamen they did so on behalf of the War Shipping Administration as principal, and there is no evidence that Shepard ever discharged any seaman.

The present case, therefore, is, as stated in the beginning of this opinion, in all its essential aspects identical with the Hust case, with the single exception that Fink was injured after the Clarification Act was passed. The effect to be given to that act remains to be considered.

As previously stated, the Supreme Court of the United States, in the Hust decision, expressly left open the question whether the Clarification Act, in its ap-

plication to claims arising after the act became effective, deprived seamen of the right to sue the General Agent under the Jones Act as their employer, and there is no binding declaration of that court on that subject. What this court said in the Hust case about the meaning and effect of section 1 of the Act did not bear on the question now presented, since we were of the opinion that, irrespective of the Act and because of the terms of the General Service Agreement, the General Agent was not the seamen's employer, and, hence, the right in question had never existed.

As shown by the Committee reports, excerpts from which are printed at the end of this opinion, the Administrator of the War Shipping Administration was desirous of maintaining the peace-time status of seamen so far as certain rights which they had long enjoyed were concerned, among others, their rights to compensation for death and injuries and to earn credits for Social Security benefits. The Administrator had not been able to carry out this policy in its entirety, because seamen employed on Government vessels were technically employees of the United States. As such, they did not have all the rights enjoyed by seamen privately employed. A seaman could not, for example, sue the United States for injury under the Suits in Admiralty Act, if the vessel on which he happened to be employed was a public vessel, and, moreover, it was difficult at times to determine whether it was a merchant or a public vessel.[4] "If they were private employees, right to redress for death, injury, or illness could be prosecuted under the Jones Act, and the gen-

---

[4] Recovery for death on a public vessel has since been sustained under the Public Vessels Act of 1925, 46 U. S. C., § 781 *et seq.* United States v. Lauro, reported *sub nom.* American Stevedores, Inc. v. Porello, 330 U. S. 446, 458-460, 67 S. Ct. 847, 91 L. ed.—(March 10, 1947).

eral maritime law." S. R. No. 62, 78th Cong., 1st Sess., 5. As Government employees, they probably had rights under the United States Compensation Act not enjoyed by seamen under private employment, but "vital differences in these rights are made to depend upon whether the seaman happens to be employed aboard a vessel time-chartered to the War Shipping Administration or owned by or bareboat-chartered to the War Shipping Administration. Since seamen constantly change from one vessel to another, their rights for death, injury, or illness also constantly change, depending upon the relationship of the War Shipping Administration to the vessel." *Idem*. The bill was designed to remove this confusion and these inequities. It did not affect "seamen employed on vessels time-chartered to the War Shipping Administration where the vessels are supplied with crews employed by the company from which the vessel was chartered. As to them, their status and the status of the government employees mentioned will be made uniform." *Idem*.

The same uniformity of status between Government employed and privately employed seamen was proposed to be achieved with respect to the Civil Service Retirement Act and the Social Security Act.

To accomplish the purposes mentioned, section 1 of the Clarification Act was adopted. It reads as follows:

"Sec. 1. That (a) officers and members of crews (hereinafter referred to as 'seamen') employed on United States or foreign-flag vessels as employees of the United States through the War Shipping Administration shall, with respect to (1) laws administered by the Public Health Service and the Social Security Act, as amended by subsection (b) (2) and (3) of this section; (2) death, injuries, illness, maintenance and cure, loss of effects, detention, or reparation, or claims arising therefrom not

covered by the foregoing clause (1); and (3) collection of wages and bonuses and making of allotments, have all of the rights, benefits, exemptions and privileges, and liabilities, under law applicable to citizens of the United States employed as seamen on privately owned and operated American vessels.

"Such seamen, because of the temporary wartime character of their employment by the War Shipping Administration, shall not be considered as officers or employees of the United States for the purposes of the United States Employees Compensation Act, as amended; the Civil Service Retirement Act, as amended; the Act of Congress approved March 7, 1942 (Public Law 490, Seventy-seventh Congress); or the Act entitled 'An Act to provide benefits for the injury, disability, death, or detention, of employees of contractors with the United States and certain other persons or reimbursement therefor', approved December 2, 1942 (Public Law 784, Seventy-seventh Congress).

"Claims arising under clause (1) hereof shall be enforced in the same manner as such claims would be enforced if the seamen were employed on a privately owned and operated American vessel.

"Any claim referred to in clause (2) or (3) hereof shall, if administratively disallowed in whole or in part, be enforced pursuant to the provisions of the Suits in Admiralty Act, notwithstanding the vessel on which the seaman is employed is not a merchant vessel within the meaning of such Act.

"Any claim, right, or cause of action of or in respect of any such seaman accruing on or after October 1, 1941, and prior to the date of enactment of this section may be enforced, and upon the election of the seaman or his surviving dependent or beneficiary, or his legal representative to do so shall be governed, as if this section had been in effect when such claim, right, or cause of action accrued, such election to be made in accordance with rules and regulations prescribed by the Administrator, War Shipping Administration.

"Rights of any seaman under the Social Security Act, as amended by subsection (b) (2) and (3), and claims therefor shall be governed solely by the provisions of such Act, so amended.

"When used in this subsection the term 'administratively disallowed' means a denial of a written claim in accordance with rules or regulations prescribed by the Administrator, War Shipping Administration. When used in this subsection the terms 'War Shipping Administration' and 'Administrator, War Shipping Administration' shall be deemed to include the United States Maritime Commission with respect to the period beginning October 1, 1941, and ending February 11, 1942, and the term 'seaman' shall be deemed to include any seaman employed as an employee of the United States through the War Shipping Administration on vessels made available to or subchartered to other agencies or departments of the United States."

■ The section may be paraphrased as follows: As to certain rights, seamen employed by the United States on Government vessels shall not be deemed employees of the United States; as to certain other rights, including the right to recover for death and injuries, such seamen shall have the same status as seamen privately employed. The remedy in the latter class of cases shall be by suit against the United States under the Suits in Admiralty Act, after the claim shall have been administratively disallowed.

■■ The question is whether Congress intended that this should be the exclusive remedy. We think that it must be so held. This was a comprehensive enactment intended to define the rights and remedies of seamen employed on United States vessels for the period of the war. It speaks in no uncertain terms of the intention of Congress to treat such seamen as employees of the United States, while according them

the same *rights* they would have had in private employment, though not the same *remedies*. Although General Agents are not mentioned, the context of the section, as well as the legislative history, excludes the notion that they were to be regarded as employers of such seamen and liable to suit as such for the causes mentioned. Had that been in the mind of Congress, there would have been no reason for the provision regarding claims for injury and death, since, as employees of the General Agent, the seamen, without any additional legislation whatever, would have had the right to sue the agent under the Jones Act, with the right to a jury trial. It would have been wholly unnecessary to accord to seamen in private employment the rights of seamen in private employment.

The act draws a clear distinction between substantive rights and the procedure for enforcing those rights. As to this it is said in *Gaynor v. Agwilines, Inc.,* (U. S. D. C. E. D. Pa.) 1948 A. M. C. 81, supplemental opinion, January 1, 1948, not reported:

" * * * Merely because Congress stated that with respect to those rights listed in clauses (2) and (3) of section 1(a) the seamen employed by the War Shipping Administration shall 'have all the rights, benefits, exemptions, privileges and liabilities, under law applicable to citizens of the United States employed as seamen on privately owned and operated American vessels', it does not follow that Congress meant that they shall have the same remedies. Congress was not haphazard, but careful in the use of terms. The omission of the word 'remedies' was not accidental but intentional."

■ This whole controversy is over the right to a jury trial in this class of cases. Yet the legislative history demonstrates conclusively that Congress, for reasons

which to it seemed sufficient, determined to withhold that right from Government-employed seamen for the duration of the war. The question arose at an early stage in the consideration of the Clarification Act, when a representative of the National Maritime Union appeared before the House Committee on the Merchant Marine and Fisheries, and stated that "unfortunately" the bill provided that claims for death, injury, and so forth, should be enforced pursuant to the Suits in Admiralty Act, and requested that section 1 be amended by allowing the claimant at his election to "maintain an action for damages at law, with the right of a trial by jury." Hearings on H.R. No. 7424, 77th Cong., 2d Sess., 31. In the same report (p. 33) appears a letter of the Attorney General under date of September 14, 1942, in which he lists three reasons why Congress might deem it inadvisable to allow jury trials in such cases. These are: First, that "it has been found that in the course of admiralty litigation information is made available to the enemy detrimental to the national safety and detrimental to the lives and safety of seamen." To prevent this an amendment to Admiralty Rule 46, which would permit such trials to be held *in camera* and the records in the proceedings to be impounded, had been adopted. But it would be difficult to make such a provision effective in jury trials. Second, Congress has rarely allowed jury trials in suits against the United States. Third, the cases will have to be tried largely on depositions, and judges are better qualified than juries to appraise evidence given in that form.

Congress, as the reports show, governed its action on this point by the advice of the Attorney General, and provided that the claims in question *shall* be prosecuted under the Suits in Admiralty Act. See H.R.

No. 2572, 77th Cong., 2d Sess., 14; S.R. No. 1655, 77th Cong., 2d Sess., 24; H.R. No. 107, 78th Cong., 1st Sess., 21.

The decision not to allow a jury trial in this class of cases is thus referred to in the Committee reports:

"Under clause 2 of section 1 (a) these substantive rights would be governed by existing law relating to privately employed seamen. The only modification thereof arises from the remedial provision that they shall be enforced in accordance with the provisions of the Suits in Admiralty Act." H.R. No. 2572, 77th Cong., 2d Sess., 14; S.R. No. 62, 78th Cong., 1st Sess., 11; S.R. No. 1655, 77th Cong., 2d Sess., 3; H.R. No. 107, 78th Cong., 1st Sess., 21.

The modification referred to is not an enlargement but a curtailment of rights. There could have been no such curtailment if seamen were to continue to enjoy the right to sue the General Agent at law under the Jones Act.

But, it is argued, Congress either did not know or was in doubt whether seamen on vessels of the United States were employees of the General Agent with the usual rights of such employees, and, not having specifically or expressly legislated against the continued exercise of such rights, the intention to do so cannot be implied, under the rule that there must be an unequivocal expression of an intention to disturb settled rights before the courts will declare that such rights have been taken away. *Hust v. Moore-McCormack Lines*, supra (328 U. S. 707, 722) ; *Brady v. Roosevelt S. S. Company*, supra (317 U. S., at p. 580).

We will not speculate on what Congress knew or thought in this regard. As stated, there is no mention of agents in section 1 of the Clarification Act. There is no mention in the Committee reports of the possible liability of agents as employers of seamen on United

States vessels, employed by the United States through the War Shipping Administration. There are several references to "an independent liability (of agents) in certain cases," as determined in the Brady case. S. R. 62, 78th Cong., 1st Sess., 8, 17; H. R. No. 107, 78th Cong., 1st Sess., 5, 29; but the Brady case did not deal with the question of the liability of an agent as an employer of seamen.[5]

There is also mention in the reports of the use by the War Shipping Administration of the services of private steamship companies in connection with the operation of the merchant fleet, and of certain of the provisions of the General Service Agreement under which the agents acted. S. R. No. 62, 78th Cong., 1st Sess., 4.

But whatever Congress may have thought as to the possibility of a holding that the seamen in question were employees of the agents, as well as of the United States, the intention to declare definitively the rights and remedies of such seamen is manifest in the first section of the Clarification Act. The purpose of Congress is emphasized by retroactive provision of section 1, which deals with claims or causes of action arising after October 1, 1941, and before the act became effective, and provides that such claims may be enforced "and at the election of the seamen * * * shall be governed, as if this section had been in effect," when such cause of action accrued. The Hust case holds that the election thus provided for was available to Hust, since his cause of action arose before the Act became effective. That is, he could either have sued the United States

---

[5] In the opinion of Mr. Justice Rutledge in the Hust case (328 U. S. 729) a footnote says of these Committee references: "These reports construe the effects of the Brady decision more narrowly than we have done in this case and than the decision justifies." The committee's construction, however, would seem to be in harmony with the view of the effects of the Brady decision expressed by the majority in the Caldarola case.

pursuant to the provisions of the Suits in Admiralty Act, or he could maintain his action against the agent under the Jones Act. No such election is given as to after-accruing claims, and none, we think, can be implied.

This conclusion is in accord with that reached by Judge Ganey of the District Court of the United States for the Eastern District of Pennsylvania in *Gaynor v. Agwilines, Inc.*, supra, and to some extent is supported by *Shilman v. United States*, (C. C. A. 2d) 1948 A. M. C. 19. The Gaynor case was a civil action against the General Agent for wages, maintenance, and cure, and for loss of personal effects. Like claims for death and personal injuries, such claims, under the Clarification Act, § 1 (a), clauses (2) and (3) "shall  *  *  * be enforced pursuant to the provisions of the Suits in Admiralty Act." The court held that the plaintiff's exclusive remedy was against the United States under that Act. The Hust case was distinguished, because it arose before the effective date of the Clarification Act. The Shilman case was a libel in admiralty against the United States and the General Agent, to recover wages. The court, in an opinion by Judge Augustus Hand, held that the seaman was entitled to recover from the United States, citing § 1 (a), clause (3), of the Clarification Act, but not from the General Agent, because the claim "arose out of a contract of employment by the United States as a disclosed principal and therefore may not be asserted against its agent." Referring to the Hust and Caldarola cases, the court said: "In each case the court was highly divided but in neither did it decide that the agent was so far the employer as to be liable to the seamen for their wages or other contractual obligations."

Plaintiff has cited *Aird v. Weyerhauser Steamship*

*Company,* (C.C.A. 3d) 1947 A.M.C. 1503, and *Cohen v. American Petroleum Transport Corp.,* (City Court of the City of New York) 1947 A. M. C. 336. In the former case, which was a libel in *personam,* Aird, a seaman, was permitted to recover wages against the agent. The case is distinguishable, because the claim arose before the Clarification Act. We are advised that a rehearing has been granted and that no final decision has yet been rendered. The Cohen decision sustained a seaman's right to recover from the agent for personal injuries under the Jones Act. Its value as authority is weakened by partial reliance on *Militano v. United States,* supra (156 F. (2d) 599), which, on the authority of the Hust case, held the General Agent owner of the vessel *pro hac vice,* but has since in effect been overruled by the Caldarola decision. For the reasons heretofore given, we are unable to agree with the New York court's view that the Clarification Act does not affect seamen's rights to sue the agents as their employers.

The case has been ably presented on both sides and in the brief of the Government, and counsel have made available to the court a mass of material which has received our consideration and has aided in the solution of the problem.

The Government, in its brief, takes the position that the Clarification Act "has no bearing on the present case". This would be true if, as the Government contends, the Hust case has been overruled or does not stand for agent liability in a case like this. Not being able to agree with these contentions, it has become necessary for us to interpret the Act. In the view we have taken of the meaning and effect of that legislation, it was error for the Circuit Court to rule adversely to the defendant upon the various motions by which it raised the question of its liability.

As this disposes of the case, there is no need to discuss other assignments of error in defendant's brief.

The judgment is reversed and the cause remanded to the Circuit Court with directions to enter judgment for the defendant.

BELT, J., dissents.

---

"*Problems arising out of Government employee status of seamen.*—Various difficulties have arisen with respect to the benefits and remedies for seamen employed by, or on behalf of, the War Shipping Administration on vessels owned or bare-boat chartered by it. These questions arise because of a technical status of such seamen as employees of the United States by virtue of their employment through the War Shipping Administration for service on such vessels.

"Because of this fact that Administrator has not been able under existing law to carry out entirely his intended policy of maintaining the peacetime status of seamen insofar as seamen's rights to compensation for injuries, and so forth, wage credits toward social-security benefits, and various other benefits which seamen have enjoyed and to which they are entitled. The purpose of section 1 of the bill is to correct the situation so as to permit to complete extension into this area of the basic policy of maintaining the private status of merchant seamen for the duration of the war.

"Seamen employed as Government employees on vessels owned by, or bareboat-chartered to, the War Shipping Administration are sometimes precluded from enforcing against the United States the rights and benefits in case of death, injury, illness, detention, and so on that would be available to them if employed by private employers, except under the Suits in Admiralty Act. If they were private employees, rights to redress for death, injury, or illness could be prosecuted under the Jones Act and the general maritime law. These same rights may be asserted against the United States as the employer under the Suits in Admiralty Act providing the vessel involved is a merchant vessel. In case of public vessels the seaman must rely for compensation upon the Administrator's policy recognizing contractual liability which this legislation recognizes. Present-day operating conditions often make uncertain in some cases whether the vessel is a merchant or a public vessel. As a consequence, even though the vessels are generally merchant vessels and not public vessels, there are some cases in which the aforementioned rights of such seamen are in doubt. In addition to these rights which, at times, are uncertain for the reasons mentioned, the seamen who are employees of the United States probably have rights under the United States Employees' Compensation Act in the event of injury or death. Such compensation benefits are not presently enjoyed by seamen under private employment. Thus vital differences in these rights are made to depend upon whether the seaman happens to be employed aboard a vessel time-chartered to the War Shipping Administration or owned by or bareboat-chartered to the War Shipping Administration. Since seamen constantly change from one vessel to another, their rights for death, injury, or illness also constantly

change, depending upon the relationship of the War Shipping Administration to the vessel. This fluctuation and lack of uniformity of rights leads to dependency of vital rights upon chance with a result of confusion and inequities. The bill is designed to remove this confusion and these inequities. The bill does not affect seamen employed on vessels time-chartered to the War Shipping Administration where the vessels are supplied with crews employed by the company from which the vessel is chartered. As to them their status and the status of the Government employees mentioned will be made uniform.

"Furthermore, these seamen who are Government employees are theoretically subject to the Civil Service Retirement Act, yet they are actually exempt for the time being because of an Executive order excluding employees engaged in certain types of services. Employees of private companies earn credits toward benefits of the old-age and survivors' insurance provisions of the Social Security Act. Under the present laws seamen who are Government employees through employment by the War Shipping Administration do not have rights under either the Civil Service Retirement Act nor is their employment covered by the Social Security Act." S. R. No. 62, 78th Cong., 1st Sess., 5. See H. R. No. 2572, 77th Cong., 2d Sess., 8; H. R. No. 107, 78th 2d Sess., 14.

"The various rights and remedies under statute and general maritime law with respect to death, injury, illness, and other casualty to seamen, have been rather fully set forth hereinabove. Under clause 2 of section 1 (a) these substantive rights would be governed by existing law relating to privately employed seamen. The only modification thereof arises from the remedial provision that they shall be enforced in accordance with the provisions of the Suits in Admiralty Act. This procedure is appropriate in view of the fact that the suits will be against the Government of the United States. In such a suit no provision is made for a jury trial as may otherwise be had in a proceeding such as one under the Jones Act for reasons set forth in the letter of the Attorney General (September 14, 1942)." H. R. No. 2572, 77th Cong., 2d Sess., 14. See, H. R. No. 107, 78th Cong., 1st Sess., 21; S. R. No. 1655, 77th Cong., 2d Sess., 3.

■ Plaintiff's petition for rehearing is based upon reasons heretofore advanced and all of which were

considered in our opinion. Nothing new is presented except that attention is called to two decisions not previously cited: *Casey v. American Export Lines* (December 17, 1947, not reported), by Judge Alfred C. Coxe of the United States District Court for the Southern District of New York, and *Warren v. United States* (March 4, 1948) by Judge Harold R. Medina, of the same court, reported in 1948 A. M. C. 568. These eminent federal judges, passing upon the same question that was before us, have reached the opposite conclusion. They have not, however, seen fit to state the reasons which influenced them. Judge Coxe filed a memorandum consisting of one sentence. Judge Medina's answer to the claim that the Clarification Act barred a recovery against the agent for maintenance and cure is: "But by the weight of authority and the weight of reason too the Clarification Act will not bear the construction which respondent would give it with respect to rights arising after the date it took effect" (citing cases).

While we regret to find ourselves in disagreement with these decisions, we are not persuaded that the prestige of the judges who rendered them should, without more, cause us to abandon our previously announced views.

The petition for rehearing is, therefore, denied.